[No. 54385-2. En Banc. December 5, 1991.]

THE STATE OF WASHINGTON, *Respondent,* v. BRIAN KEITH LORD, *Appellant.*

830

834

836

*Brian Keith Lord*, pro se, *Bertha B. Fitzer*, and *Michael J. Trickey*, for appellant.

*C. Danny Clem, Prosecuting Attorney*, and *Irene K. Asai* and *Pamela B. Loginsky, Deputies*, for respondent.

DURHAM, J. — On September 30, 1986, the half-clothed body of 16-year-old Tracy Parker was found by a horse-back rider. She had been raped, murdered, and dumped in

the brush by the side of a road. Tracy had been missing for more than 2 weeks before she was discovered.

Brian Keith Lord was convicted by a jury in the Kitsap County Superior Court of aggravated first degree murder. The jury found that there were not sufficient mitigating circumstances to warrant leniency, and Lord was sentenced to death. He appealed directly to this court pursuant to the mandatory review provision of Washington's death penalty statute, RCW 10.95.100. Finding no reversible error, we affirm.

We begin with a brief statement of the State's theory of the case in order to provide a context in which to assess the complicated facts of this case. The State relied on well over 100 pieces of trace evidence to support its theory. According to the State, Tracy Parker (Tracy) encountered Brian Keith Lord (Lord)[1] at the house of a mutual acquaintance at approximately 8 p.m. on Tuesday, September 16, 1986. Tracy and Lord had known each other for approximately 3 years. She was late getting home and asked Lord for a ride. He tricked her into going to his brother's house after ensuring that no one was there. Once in his brother's workshop, Lord struck her from behind with a hammer, knocking her unconscious, and raped her. He then struck her repeatedly with the hammer, fracturing her skull, and inflicting an additional wound to her vagina. Lord then wrapped her dead body in a U-Haul blanket, put it in the back of his brother's blue pickup truck, and disposed of the body, the blanket, and the clothing at separate locations.

Lord immediately returned to his brother's house, where he hosed out the workshop and the back of the truck. The next morning he returned and continued to clean the shop and the truck. Later, Lord attempted to cover evidence of blood in the workshop by rubbing grease into the spot on the floor where Tracy's body had been.

---

[1] To avoid confusion, defendant Brian Keith Lord shall be referred to throughout this opinion as "Lord". After appropriate introduction, other members of his family will be referred to by their first names only.

Lord also offered bribes to friends and acquaintances to cover his actions. Lord denied that he had committed the crime.

## FACTS

We now turn to the evidence which was presented to the jury. On September 16, 1986, 16-year-old Tracy Parker arrived home from school at approximately 3 p.m. She told her mother that she was going riding. Tracy had permission to ride horses belonging to Wayne and Sharon Frye whenever she wanted. The Fryes lived less than a mile away from Tracy and hidden keys provided access to the Fryes' house and equipment area. Tracy's mother told her to be home before dark, by 7 or 7:30 p.m., and then left for work.

No one was at the Frye residence when Sharon Frye left the house shortly before 6 p.m. or when she returned at approximately 8:20 or 8:30 p.m. She did notice the next day that the riding gear was in place.

At 7:15 p.m., Tracy rode to the house of a neighbor and stopped to talk for about 10 or 15 minutes. From 7:30 to 7:45 p.m., Tracy stopped to visit a friend who was babysitting at a nearby residence. As Tracy left, she said she had to "hurry and get home before her mom got home." She told her friend that she was going to "[t]ake the horse back to the Fryes' house and go straight home." At 8 p.m., Tracy called a friend, apparently from the Frye residence. Tracy was not home when her mother returned from work shortly after 9 p.m.

The defendant, Brian Keith Lord, had known the Fryes for 3 years. Lord is a carpenter and, during September 1986, he helped the Fryes remodel their house. He also had access to their house, and he knew where the keys were kept. Lord met Tracy through the Fryes and had spoken with her a number of times when she came to ride. Sometimes he gave Tracy a ride home, occasionally in a blue pickup truck owned by his brother, Kirk Lord.

Between 6:30 and 7 p.m. on September 16, Lord met with a contractor, Chris Rongve, in the Silverdale area to

discuss construction work. At that point, Lord was driving a Camaro that belonged to his girl friend, Debby Parker (no relation to Tracy Parker). Rongve observed that Lord was wearing an orange plaid shirt and either gray sweatpants or blue Levi's. Rongve also saw Lord take a drink from a large beer bottle. Lord left the meeting before 7:30 p.m. Although Lord was to meet with Rongve again the next day, Lord never appeared.

At 7:44 p.m., Lord made an 8-minute, long-distance call from the Fryes' house to his apartment to tell his girl friend that he would be late for dinner. He also called his brother's house. The State theorized that Lord made these calls to ensure that no one would be looking for him and that no one was at his brother's house.

That same evening, Don and Radwyn Carroll were also at Kirk Lord's house. They are the parents of Kirk's wife, Robin. Don had been hauling firewood to Kirk's house all day and was joined by his wife on the third trip. Kirk and Robin were out of town, and the Carrolls had been watching the house. The Carrolls arrived at Kirk's at approximately 4:30 p.m. Radwyn saw Lord driving out of Kirk's driveway just as they were approaching it. They did not stop and talk with him. During their visit, Radwyn looked in Kirk's workshop and noted that it looked clean. At that time, Kirk's blue pickup was parked in front of the garage.

After Don unloaded the firewood, the Carrolls left for dinner. They did not return to Kirk's house until approximately 8:30 p.m. When they returned, Debby Parker's Camaro was parked in front of the workshop and the blue pickup was gone. Don noticed a smoldering "burn pile" in the yard by the side of the house.

About 15 to 20 minutes after the Carrolls arrived, Lord drove up to the workshop in the blue pickup. He was driving "[p]retty fast" and the truck was "smoking and steaming." Lord was aware that the truck had a faulty head gasket and that he should not be driving the truck

because it could ruin the engine. Even though it was only about 58 degrees, Lord was not wearing a shirt.[2]

Don went into the house and watched Lord from the window. Lord, still without a shirt, began washing the blue pickup. Using a hose, he washed out the back of the pickup, even though it was full of debris. He took a blanket from the back of the truck and threw it on the ground in an area where water was running from the hose. Don remembered that the blanket was beige or orange.

When Don went out to talk to Lord, Lord told Don he was building a stereo cabinet for Kirk and Robin. But when Don asked to see it and walked toward the workshop, Lord said, "No, I don't want you to see it yet, I want Kirk to be the first one to see it." Don agreed and did not enter the workshop that evening.

At approximately 9 p.m., Kirk and Robin arrived home. Don and Radwyn visited with Robin and Kirk inside the house. Lord did not enter the house, but he visited with Kirk in front of the workshop for several minutes. Kirk remembered Lord wearing gray pants and a shirt. Lord did not show Kirk any cabinet or table, and Kirk also did not enter the workshop that evening. When the Carrolls left at approximately 10:30 p.m., Lord was gone.

A dinner party had been planned for that night at Lord's house, and the guests had been waiting for him when he called at 7:44 p.m. Lord was to have brought a dining table that he was making for them to use that evening. When Lord had not appeared by 10 p.m., they ate without him.

Lord finally arrived home at approximately 10:15 p.m., wearing gray sweatpants and a plaid shirt. He stood in the doorway for a couple minutes, and then walked into the bathroom. Although the guests waited in the living room, some of them left at 10:30 p.m. when Lord had not

---

[2]On September 16, 1986, the temperature recorded approximately 10 miles from the murder scene by the United States Navy was 59 degrees at 8 p.m., 57 degrees at 9 p.m., and 56 degrees at 10 p.m.

come out. When Lord finally appeared, he was acting unusual. Two guests noticed that Lord had a fresh wound on his arm. Lord told them he was late because he had been working, but he did not say where. He did not bring a table home.

The next morning, September 17, Tracy had not returned and her mother began making telephone inquiries. She also went to the Fryes' because it was the last place she knew Tracy had been. After speaking to Sharon Frye, Tracy's mother went home and called the sheriff's office to report Tracy missing. In addition to notifying the sheriff, a private investigator was called in, bloodhounds were used, and the family searched the area themselves. Tracy was not seen alive after September 16.

At 8 o'clock that morning, Lord arrived back at Kirk's house. Lord began cleaning the debris out of the blue pickup and putting it into his truck. There was about a foot of debris in the blue pickup. Lord then hosed out the remainder of the debris.

When Kirk looked into the workshop that morning, he noticed water puddles on the floor as if it had been washed out recently. A photo showed possible water stains on the bottom of all of the doors that had been stored in the workshop. Kirk said that the doors had not been water stained before he went to California.

Testimony was given by Robert Machinski, who had met Lord while doing construction work. According to Machinski, Lord had called him on September 15 to ask him to help burn scrap wood at Kirk's. Approximately 30 sections of old, green cedar fence panels were stacked in front of the garage door and Lord wanted to burn them. Lord told Machinski he had brought the scrap wood in the blue pickup, which was then parked at Kirk's. After they burned the lumber, they swept the remaining scraps and sawdust and paint chips into a pile and then onto an orange U-Haul blanket. As they flipped the debris into the fire, Lord dropped his end of the blanket into the fire. Machinski saw sparks on the blanket. They shook out the blanket, folded it and set it on a pile of wood near the

garage. Lord was wearing gray sweatpants, which Machinski did not see Lord wear again after that night. The gray sweatpants were never located.

A few days later, Machinski was again at Kirk's with Lord to work on the blue pickup. Lord drove the pickup halfway into the workshop. Machinski observed Lord scrape some grease and sludge off the engine and throw it on the workshop floor. Lord then took a rag or piece of cardboard and smeared the grease and sludge into the middle of the floor. Grease would damage any wood products it touched.

During the weekend of September 20, Lord and his girl friend told her father that the searching should occur "in the Island Lake area because that would be a good area to look for if somebody was — something had happened to them."

At the same time, two members of an organized search team found shoes, jeans, a jacket and panties by a dirt road near Island Lake. These clothes were identified as Tracy's. In addition, they also found a red sweatshirt that was never identified. A "D.D. Bean & Sons Company" matchbook was found under the clothes. A torn red print towel was also found with the clothes. Once the clothing had been found, the sheriff's office took over the investigation.

On Monday, September 22, a search of a housing construction area near Island Lake turned up an orange blanket with the words "U-Haul Moving and Storage" printed on it. The blanket was found lying on top of brush. The vegetation under the blanket had no yellowing, indicating that the blanket had been there only a short time. The blanket was not moldy or smelly. Kirk reported owning an orange U-Haul blanket that was missing. When Machinski learned that the blanket had been turned up, he went to the police and told them that he and Lord had used such a blanket when burning scrap wood. Lord had worked at a jobsite near where the blanket was found.

Both Tracy's clothes and the orange blanket contained trace evidence which tied Lord to the crime. Hair, washed sand, white and green paint chips, charcoal, plaster, wood chips and sawdust were all found. In all, 30 categories of trace evidence were introduced, representing even more individual pieces of evidence. These fragments of wood chips, paint and fibers were linked to 25 separate items or locations, including Tracy's body, her clothing, Kirk's workshop, and the blue pickup. Type "O" human blood was found on the jacket, blue jeans, red sweatshirt, towel, and also on the U-Haul blanket. Tracy's blood type was "O". Lord's blood type is "A". While there was also human blood on the panties, there was not enough to type. In addition, Tracy's blood contained an enzyme known as ADA 2-1, found in only 9 percent of the white population. This enzyme was found in the bloodstain on the U-Haul blanket.

Evidence pertaining to hair was also introduced to link Lord to the crime. A coarse body hair, which could have come from Lord but could not have come from Tracy, was found on the U-Haul blanket. A head hair that had the same characteristics as Tracy's was also found on the blanket. A hair was found on the red sweatshirt which was not similar to either Lord's or Tracy's head hair, but resembled hair found in the hair brush in Debbie Parker's car. There were also coarse body hairs on the red towel which were similar to both Lord's and Tracy's.

On September 24, the origin of the red towel was discovered during an interview with Wayne Frye at the sheriff's office. Frye had used a towel as a curtain on his garage door. At some point, he had taken it down and put it with other rags. When he was taken to the evidence room and shown the red towel found with Tracy's clothes, he identified it as his.

On September 29, 1986, Donald Phillips, a forensic scientist employed by the Washington State Crime Laboratory, came to Kitsap County at the sheriff's request to aid in the investigation. Phillips and two detectives investigated Kirk's workshop after one of the detec-

tives happened to notice wood chips and sand at the workshop that were similar to the trace evidence found on Tracy's clothing. Samples of this trace evidence were taken and sent to the crime laboratory for comparison. Phillips then used leuco-malachite green[3] to examine the blue pickup, the workshop, and the surrounding area for the presence of blood. Some items were sprayed and others were tested by applying the leuco-malachite green with a swab.

Phillips and the detectives noted a positive reaction, consistent with the presence of blood, on the workshop floor. The pattern shown on the floor appeared to be in concentric circles. He sprayed a 6-foot square area near the door and noticed a reaction in circular pattern approximately 18 inches in diameter at its widest point. Phillips opined that the concentric pattern resulted from someone wiping something up. He also sprayed the large oil stain, which had been created by Lord, that was on the floor. Phillips observed a positive reaction consistent with the presence of blood around the perimeter of the stain.

Phillips tested a number of tools without reaction. He then sprayed some coiled extension cords which were lying next to the stain on the floor. In so doing, he sprayed a claw hammer that was lying underneath the cords. When he saw the hammer and noticed a positive reaction, he realized that he might have inadvertently sprayed the murder weapon, thereby impairing the crime laboratory's ability to do further, more specific, testing. He immediately took the hammer out to the two detectives, who both saw the positive reaction.

There was also a reaction consistent with blood on a door stacked in the workshop. On the inside of the garage door, about 6 to 18 inches above the floor, there were drops of blood shaped as if they had hit the door at high

---

[3]Leuco-malachite green is a low sensitivity reagent that yields a characteristic green color in a matter of 15 to 20 seconds when it comes in contact with blood. It is a presumptive, rather than specific, test because leuco-malachite green will also react in the presence of other substances including some vegetable juices, some metals, and rust.

velocity. Phillips chipped some drops off the door to be tested at the crime lab. These drops proved to be Tracy's blood type, type "O" human blood.

In November 1986, a controversy arose over Phillips' handling of the evidence at the workshop. The Washington State Crime Laboratory initiated an investigation, which was not completed because Phillips resigned in December 1986. During trial, an extended evidentiary hearing was held to determine the extent of any possible misconduct by Phillips or the State.

In addition to the physical evidence connecting Lord to the crime, Lord made inconsistent statements about his whereabouts and activities. On Wednesday, September 24, detectives working on the case first contacted Lord at his apartment. At that time, Lord told them he had last seen Tracy about 2 weeks prior, either on a Wednesday or a Thursday when she was at the Fryes' riding. He told them that on September 16 he had been at his brother's house polishing his brother's truck. He claimed that he had been there alone early in the afternoon making a coffee table and that "no one had either arrived or departed while he was there." He had also made a "dump run" using his brother's truck. Lord reported that between 6 and 7 p.m. he had gone to the Fryes' house. Lord used a hidden key to enter the house to call his brother. He stayed about 5 minutes, then returned to his brother's and "partied" for about an hour. Lord said he was expecting his brother to return home from California, where he had been for several months. Lord said he returned to his apartment between 9 and 10 p.m.

Three days later, on September 27, Lord was at the Fryes' at the same time as two detectives. In another conversation, Lord commented that he hoped that Tracy was only a missing person. Later that evening, however, Lord told a witness that he was probably the last one to see Tracy alive, even though no one knew yet that she had been killed.

On September 30, detectives again questioned Lord. Even though he related essentially the same account of

his activities on September 16, there were inconsistencies. Lord said he had arrived at Kirk's house between 8 and 9 p.m. Although he had previously said that he had seen no one while there, he now claimed that Don and Radwyn Carroll were there the entire time. Contradicting the Carrolls' recollection, Lord claimed that he had last driven Kirk's blue pickup on September 14, and that that was also the last time he had seen Tracy.

Lord next spoke with another detective. He appeared nervous and was shaking during his conversation. Lord told that detective that he drank beer and last smoked marijuana approximately 3 weeks earlier. He added that when he smoked marijuana and drank beer, "he becomes a different person and he loses control."

While Lord was being questioned on September 30, Tracy's body was found. A horseback rider discovered the semi-nude body lying a short distance from the edge of Clear Creek Road, about 3 miles from Kirk's house.[4] That evening, Lord was arrested.

Detective Morgan immediately examined the scene where Tracy's body was found. When he lifted a section of Tracy's hair, he observed a circular indentation about the size of a quarter, approximately three-fourths of an inch, and one-eighth to one-fourth inch deep. The depth was even within the entire indentation. Detective Reichert, a trained specialist with the Criminal Investigations Division on Special Task Force, was also present. At trial, he opined that whoever disposed of the body did not try to hide it. He also said that the body had been carried, not dragged. He, therefore, expected blood to be transferred from the body to the person carrying it. This was consistent with the State's theory at trial that Lord hurriedly disposed of the body, then cleaned up at Kirk's. It also explained Lord's attempts to stay out of the light — he did not wish to have the blood on him detected.

---

[4]The 3-mile distance from Kirk's house to the body can be driven at the speed limit in 5 minutes 53 seconds. The 3-mile distance from the Fryes' to Kirk's takes about 6 minutes 30 seconds.

On October 2, an autopsy was done on Tracy's body. The medical examiner testified that Tracy had died 10 to 20 days prior to the date of the autopsy. He found evidence of six separate soft tissue wounds at various locations on Tracy's head. All of these injuries were from a blunt instrument that caused lacerations. One wound, on the back of her head, was roughly circular, approximately 1 to 1¼ inches in diameter. There were also wounds to the side and front of her head that had fractures beneath them. The impact required to cause such fractures was the same as the impact of a fall from several stories and was of a degree of force that could cause her death. There were also injuries to Tracy's front teeth. In all, there had been a minimum of seven impact blows, possibly more, to Tracy's head. The wounds could have all been inflicted within approximately the same time frame, but it was impossible to say which one came before another. They were all probably inflicted within a matter of minutes or hours. The blows which produced the fracture to the right front of the skull probably caused death, not instantaneously, but within a matter of minutes, and would render the victim unconscious. There were no defensive wounds on her body. A wound was discovered in the genital area, approximately 1 inch in length and three-fourths inch deep, which the medical examiner opined was caused by blunt force. He also found sperm in her vagina. All of Tracy's injuries could have been caused by a hammer.

The blue pickup was impounded on October 1. When floor sweepings from the passenger side of the cab of the pickup were examined, a matchbook from D.D. Bean & Sons Company was found, which was similar to the one found with Tracy's body.

Testimony was also given that, on several occasions, Lord attempted from jail to influence people to change their statements. On October 11, Lord told his friend Machinski that he would have given him a motorcycle had Machinski come to visit him before telling the detectives about the U-Haul blanket. At a second visit, Lord told

Machinski that if he remembered the blanket being pink, instead of orange, he could have $1,000 and Lord's truck.

Lord was also visited in jail by Thomas DeMars, who had known Lord for 3 or 4 years. DeMars testified that during a visit on October 19, Lord asked him to tell the sheriff that DeMars was driving the blue pickup on September 16 between 7:30 and 8 p.m. Lord said that he would give his truck and a Yamaha dirt bike to anyone who would claim to have been driving the blue pickup at that time. After the visit, DeMars said Lord called him several times to see if he had found such a person.

Lord made incriminating statements while in jail. In a conversation with Sonny Belgard, an inmate trusty, Lord stated "hypothetically" that he had "bonked" Tracy on the head with a mallet or hammer, then panicked and "left, came back and wrapped up her body in the blanket and threw it in the back of his truck and dumped her." Belgard testified that Lord was shaking as he told this story. Lord said it was an accident and that he wished it had not happened. He told Belgard that he was afraid of the prosecutor, because the prosecutor would "eventually piece this together."

Rex Harvey was also a trusty at the Kitsap County Jail while Lord was there. He testified that while he was mopping the floor near Lord's cell, Lord asked if he "wanted to hear a story." When Harvey did not respond, Lord said: "I hit her in the head with a hammer, raped her in the back of my truck and threw her in the ditch." Two or three days later, Lord commented to Harvey, again without prompting: "I asked her to go cruising around with me at the house I was remodeling, that's where she kept her horse. I hit her in the head with a hammer, raped her in the back of my truck, threw her in a ditch". He told Harvey that he "got blood on a U-Haul blanket."

Lord was charged with aggravated first degree murder and felony first degree murder. The State filed timely notice of intent to seek the death penalty. After deliberations, the jury found Lord guilty of first degree murder. By use of a special verdict form, the jury also found that

Lord had committed aggravated first degree murder. The aggravating factors were: (1) the murder was committed to conceal the crime of first or second degree rape or first or second degree kidnapping; (2) the murder was committed to protect or conceal the identity of any person committing the crime of first or second degree rape, or first or second degree kidnapping; and (3) the murder was committed in immediate flight from the crimes of first or second degree rape or first degree kidnapping.

The jury was then reconvened for a special sentencing hearing. After the jury found that there were no sufficient mitigating circumstances to warrant leniency, Lord was sentenced to death. Lord appealed directly to this court pursuant to the mandatory review provision of Washington's death penalty statute, RCW 10.95.100.

■ Lord raises a number of issues based on alleged procedural and constitutional errors in both the guilt phase and the penalty phase of his trial. Errors alleged in connection with the guilt phase of a capital case are reviewed no differently than those in noncapital cases. However, as will be made clear in the discussion of the penalty phase, claims of error raised in connection with the sentencing phase of a capital case are subjected to heightened scrutiny.

■ A number of the errors alleged by Lord are raised for the first time on appeal. The general rule is that appellate courts will not address issues not raised in the trial court. RAP 2.5(a); *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988). However, procedural rules are more liberally construed in capital cases. *State v. Jeffries*, 105 Wn.2d 398, 418, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986). Further, claims based on a "manifest error affecting a constitutional right" may be raised for the first time on appeal. RAP 2.5(a)(3). Our review begins with errors alleged in connection with the guilt phase.

GUILT PHASE
Trace Evidence

The State presented expert testimony by members of the Washington State Crime Laboratory (crime lab) on

microanalysis and blood comparison analysis. Microanalysis is the identification and comparison of minute particles and objects. In this case, hair, fibers, metal fragments, paint chips, wood chips, charcoal, and plaster were analyzed. The blood was typed using electrophoresis. The presence of seminal fluid was detected using an acid phosphatase test. Hair and fiber comparisons were done with a comparison microscope, which consists of two microscopes connected by an optical bridge with a single set of eyepieces. Paint chips and metal fragments were tested with infrared spectroscopy, x-ray fluorescent spectroscopy, epi-illumination microscopy and a microspectrophotometer.

■ Lord claims that none of these tests were independently validated as generally accepted in the scientific community and, thus, do not meet the standards of admissibility as set forth in *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923) (adopted by this court in *State v. Woo*, 84 Wn.2d 472, 473, 527 P.2d 271 (1974)). *Frye* requires that novel scientific evidence be based on scientific principles and methods which are sufficiently established to have gained general acceptance in the scientific community. *Frye*, at 1014.

■ The scientific principles and methods used by the crime lab for blood comparison and microanalysis are generally accepted and are admitted regularly in courts all over the country. Evidence of blood typing using electrophoresis has been admitted in most courts long before the Lord trial, as well as since. *See, e.g., People v. Smith*, 215 Cal. App. 3d 19, 25, 263 Cal. Rptr. 678 (1989) (not error for trial judge to take judicial notice of previous findings of acceptability of electrophoresis); *Santillanes v. State*, 104 Nev. 699, 703-05, 765 P.2d 1147 (1988) (there was sufficient evidence of the test's trustworthiness and reliability to permit results); *State v. Adams*, 418 N.W.2d 618, 621 (S.D. 1988) (sufficient documentation of reliability and criticism of test goes to credibility, not admissibility); *People v. Partee*, 157 Ill. App. 3d 231, 261-63, 511 N.E.2d 1165 (1987) (forensic serologist's testimony of

results of electrophoresis admissible, and reliability is question of weight), *cert. denied*, 484 U.S. 1072 (1988); *Graham v. State*, 168 Ga. App. 23, 23-26, 308 S.E.2d 413 (1983) (testimony of expert admissible); *Robinson v. State*, 47 Md. App. 558, 574-76, 425 A.2d 211 (1981) (electrophoresis found to be accepted in scientific community of forensics). *But see People v. Lewis*, 160 Mich. App. 20, 27, 408 N.W.2d 94 (1987) (electrophoresis has not achieved general scientific acceptance (relying on *People v. Young*, 425 Mich. 470, 391 N.W.2d 270 (1986))).

The acid phosphate test is a regularly accepted procedure for determining whether sexual activity has occurred. It is used in rape cases routinely. *See, e.g., Evans v. State*, 547 So. 2d 38, 39 (Miss. 1989) (acid phosphate test part of rape evidence kit collected by examining physician); *State v. Neal*, 535 So. 2d 757, 760 (La. Ct. App. 1988) (testimony of criminalist); *Commonwealth v. Willie*, 400 Mass. 427, 430, 510 N.E.2d 258 (1987) (testimony of serologist); *Andrade v. State*, 700 S.W.2d 585, 586 (Tex. Crim. App. 1985) (testimony of county medical examiner), *cert. denied*, 475 U.S. 1112 (1986); *State v. Singleton*, 102 N.M. 66, 68, 691 P.2d 67 (Ct. App. 1984) (testimony of forensic serologist); *State v. Harper*, 637 S.W.2d 170, 171, 173 (Mo. Ct. App. 1982) (court ordered defendant to submit to acid phosphate test and a police serologist testified as to the results).

In *State v. Fagundes*, 26 Wn. App. 477, 483, 614 P.2d 198, *review denied*, 94 Wn.2d 1014 (1980), our Court of Appeals allowed expert testimony as to the presence of acid phosphatase. The expert witness from the crime lab, who was also called at the Lord trial, testified extensively about her testing methods and their general acceptability in the scientific community.

Dr. Edward Suzuki testified at trial that infrared spectroscopy and x-ray fluorescent spectroscopy are widely accepted in the scientific community. *See State v. Ford*, 110 Wn.2d 827, 835, 755 P.2d 806 (1988) (scientific principles of infrared spectroscopy established and accepted). These methods of microanalysis have also been generally

admitted in court. *See, e.g., Irvin v. State*, 28 Ark. App. 6, 12, 771 S.W.2d 26 (1989) (testimony of criminologist regarding x-ray fluorescence); *State v. Crabb*, 107 Idaho 298, 305, 688 P.2d 1203 (Ct. App. 1984) (testimony of criminalist regarding infrared spectroscopy); *State v. Needs*, 99 Idaho 883, 887, 591 P.2d 130 (1979) (x-ray fluorescence evidence admitted); *People v. Trock*, 45 Ill. App. 3d 294, 297, 359 N.E.2d 836 (1977) (testimony of FBI crime lab employee on testing of bone with x-ray fluorescence); *Commonwealth v. Shea*, 28 Mass. App. Ct. 28, 545 N.E.2d 1185 (1989) (infrared spectroscopy used in drug identification); *People v. Jones*, 118 Misc. 2d 687, 688-94, 461 N.Y.S.2d 962 (Albany Cy. Ct. 1983) (Intoximeter 3000 breath test based on infrared spectroscopy admissible); *State v. Dorsey*, 58 Or. App. 521, 523, 648 P.2d 1304 (1982) (intoxilyzer test based on infrared spectroscopy admitted (relying on *State v. Moore*, 307 A.2d 548, 549 (Del. Super. Ct. 1973))).

Although research did not reveal any cases dealing specifically with epi-illumination microscopy, this method of analysis is also valid. It utilizes a microscope with illumination coming down from the side of the sample and reflected off the sample, rather than passing light upward through the sample as regular microscopes do. It is helpful in analyzing nontransparent particles such as paints and metals. The general acceptability of microscopes is unquestionable.

Spectrophotometers are also widely used in criminal cases to examine evidence. *See, e.g., State v. Anderson*, 41 Wn. App. 85, 99, 702 P.2d 481 (1985) (criminologist testified as to use of spectrophotometer to chemically compare red markings on shell casings), *rev'd on other grounds*, 107 Wn.2d 745, 733 P.2d 517 (1987); *Williams v. State*, 251 Ga. 749, 756, 312 S.E.2d 40 (1983) (results of fiber comparison using microspectrophotometer admitted); *State v. DeMille*, 763 P.2d 5, 8 (Hawaii Ct. App. 1988) (instrument used in blood alcohol analysis); *State v. Lawson*, 393 So. 2d 1260, 1266 (La. 1981) (expert testimony concerning results of mass spectrophotometer test

performed on drugs admitted); *Munson v. State*, 758 P.2d 324, 329 (Okla. Crim. App. 1988) (testimony of criminalist who used spectrophotometer in metal comparison), *cert. denied*, 488 U.S. 1019 (1989); *State v. Dorsey*, 58 Or. App. 521, 523 n.2, 648 P.2d 1304 (" 'spectrophotometers are routinely used by chemists to test for the presence and quantity of certain compounds' " (quoting *Dayton v. Schenck*, 63 Ohio Misc. 14, 16, 409 N.E.2d 284 (Dayton Mun. Ct. 1980)), *review denied*, 294 Or. 295 (1982); *Commonwealth v. Seville*, 266 Pa. Super. 587, 589, 405 A.2d 1262 (1979) (spectrophotometer used in enzyme analysis to show blood alcohol content).

Lord contends that the trial judge erred in allowing the witnesses to testify that particular items of trace evidence "could have" shared a common source or that they had "similar" characteristics. This speculative testimony, claims Lord, violates his equal protection and due process rights. Lord's arguments amount to a claim that, notwithstanding the general acceptance of the methods used here, the trace evidence was inadmissible because the conclusions testified to by the expert witnesses were not sufficiently reliable.

Lord cites no authority establishing that criminal and civil litigants are similarly situated for the purpose of equal protection analysis. Accordingly, we decline to reach this issue. *See State v. Dennison*, 115 Wn.2d 609, 629, 801 P.2d 193 (1990).

As for Lord's due process claim, we note that expert testimony couched in terms of "could have", "possible", or "similar" is uniformly admitted at trial. The lack of certainty goes to the weight to be given the testimony, not to its admissibility. This is so, in part, because the scientific process involved often allows no more certain testimony.

In *State v. Batten*, 17 Wn. App. 428, 563 P.2d 1287, *review denied*, 89 Wn.2d 1001 (1977), the defendant argued that the "could have" language of the expert witness's testimony pertaining to hair analysis lacked sufficient certainty to give efficacy to the witness's opinion. The Court of Appeals held that the conclusion offered

by the witness reflected the state of the art of scientific comparison of hair. *Batten*, 17 Wn. App. at 437. *See* A. Moenssens, F. Inbau & J. Starrs, *Scientific Evidence in Criminal Cases* § 8.09 (3d ed. 1986) (no known way of positively identifying hair as having come from a particular individual). *See also State v. Bernson*, 40 Wn. App. 729, 736, 700 P.2d 758 (an expert's use of "could have" or "possibility" has been allowed in cases where less than an exact scientific process is involved), *review denied*, 104 Wn.2d 1016 (1985).

The weight to be given the expert's conclusion is generally left to the jury. *Batten*, 17 Wn. App. at 438. *See also United States v. Brady*, 595 F.2d 359, 363 (6th Cir.), *cert. denied*, 444 U.S. 862 (1979); *United States v. Oaxaca*, 569 F.2d 518, 526 (9th Cir.) (necessarily imprecise nature of the hair identification went to the weight of the testimony, rather than its admissibility), *cert. denied*, 439 U.S. 926 (1978); *United States v. Cyphers*, 553 F.2d 1064, 1072-73 (7th Cir.), *cert. denied*, 434 U.S. 843 (1977); *United States v. Baller*, 519 F.2d 463, 466 (4th Cir.), *cert. denied*, 423 U.S. 1019 (1975); *Jent v. State*, 408 So. 2d 1024, 1029 (Fla. 1981) (that hair analyst could not positively identify hair as defendant's went to weight, not admissibility), *cert. denied*, 457 U.S. 1111 (1982); *People v. Novak*, 94 Ill. App. 3d 1024, 1028, 419 N.E.2d 393 (1981) (testimony of microanalyst that hairs similar admissible and not too speculative, but weight up to jury); *Paxton v. State*, 159 Ga. App. 175, 179, 282 S.E.2d 912 (1981) (expert testimony that hairs could have common origin not pure speculation and question was not of admissibility but weight), *cert. denied*, 248 Ga. 231, 283 S.E.2d 235 (1981), *aff'd*, 735 F.2d 1306 (11th Cir.), *cert. denied*, 469 U.S. 935 (1984); *People v. Allweiss*, 48 N.Y.2d 40, 50, 421 N.Y.S.2d 341, 396 N.E.2d 735 (1979) (generally conclusive results are not required and value of hair analysis, with its limitations, is recognized).

In sum, the methods used by the Washington State Crime Laboratory are generally accepted within the scientific community. Further, an expert's lack of certainty

goes to the weight of the testimony, not its admissibility. Accordingly, we conclude that the trace evidence was properly admitted.

## Summary Charts

Lord contends that he was denied due process by the admission of demonstrative evidence in the form of two summary charts and by the decision to send the charts to the jury room during deliberations. The charts, exhibits 141 and 143, summarized the State's trace evidence. Lord argues that the admission and use of the charts during deliberations amounted to an unconstitutional comment on the evidence. Furthermore, he argues that the charts should not have been admitted because they reduced the experts' speculative testimony to nonspeculative terms and, as such, were improperly conclusory and argumentative.

The use of demonstrative or illustrative evidence is to be favored and the trial court is given wide latitude in determining whether or not to admit demonstrative evidence. *State v. Chapman*, 84 Wn.2d 373, 378, 526 P.2d 64 (1974); 5 K. Tegland, Wash. Prac., *Evidence* § 94, at 300 (3d ed. 1989). Illustrative evidence is appropriate to aid the trier of fact in understanding other evidence, where the trier of fact is aware of the limits on the accuracy of the evidence. *Norris v. State*, 46 Wn. App. 822, 827, 733 P.2d 231 (1987). A summary "can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses throughout the trial." *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983), *cert. denied*, 467 U.S. 1226 (1984).

Because a summary chart submitted by the prosecution can be a very persuasive and powerful tool, the court must make certain that the summary is based upon, and fairly represents, competent evidence already before the jury. *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir.), *cert. denied*, 434 U.S. 831 (1977). This does not mean, however, that there can be no controversy as to the evidence presented. Rather, the chart must be a substan-

tially accurate summary of evidence properly admitted. The jury is then free to judge the worth and weight of the evidence summarized in the chart. *Epstein v. United States*, 246 F.2d 563, 570 (6th Cir.), *cert. denied*, 355 U.S. 868 (1957).

The fact that summary charts can be a very persuasive tool also gives rise to concerns associated with their use. The jury might rely upon the alleged facts in the summary as if these facts had already been proved or as a substitute for assessing the credibility of witnesses. *United States v. Scales*, 594 F.2d 558, 564 (6th Cir.), *cert. denied*, 441 U.S. 946 (1979). There is also the possibility that the jury will treat the summary as additional evidence or that the summary will provide extra summation for the government. *Lemire*, at 1348. These reservations have led to the requirement of "guarding instructions" to the effect that the chart is not itself evidence, but is only an aid in evaluating the evidence. *Scales*, at 564; *Lemire*, at 1347.

Such instructions are not the only protection against the concerns sometimes associated with summary charts. The trial court has a duty to ensure that such charts are substantially accurate. The court fulfills this duty, in part, by allowing the defense full opportunity to object to any portions of the summary chart before it is seen by the jury. Moreover, the concern that the jury might rely upon the alleged facts in the summary as if they had already been proved is minimized by allowing complete cross examination of any witnesses testifying in connection with the summary. *Lemire*, at 1348.

When a summary or chart is used for illustrative purposes only and the jurors are instructed that the summary is not evidence, the summary should not go to the jury room. *McCartney v. Old Line Life Ins. Co. of Am.*, 3 Wn. App. 92, 93-94, 472 P.2d 581, *review denied*, 78 Wn.2d 995 (1970); 5B K. Tegland, Wash. Prac., *Evidence* § 495, at 386 (3d ed. 1989).[5] It should be utilized only dur-

---

[5]In contrast, a summary of complicated or voluminous writings, recordings, or photographs admitted pursuant to ER 1006 is substantive evidence that does go to the jury room. 5B K. Tegland § 495, at 386.

ing the initial presentation of testimony and/or in final argument by counsel. *McCartney*, at 93-94. However, if the chart is sent with the jury, reversal is required only if, upon a review of the entire record, the court determines that the defendant was prejudiced. *United States v. Abbas*, 504 F.2d 123, 125 (9th Cir. 1974), *cert. denied*, 421 U.S. 988 (1975). Thus, there are two questions which need to be addressed: (1) were the charts properly admitted for illustrative purposes, and (2) was Lord prejudiced by the charts being sent to the jury room?

The charts at issue are State's exhibits 141 and 143. Exhibit 143 summarized the testimony of a number of experts and reflected testimony regarding trace evidence of charcoal, blood, paints, plaster, metal flakes, fibers, and wood chips. This chart summarized the testimony of Cindy Jay, Michael Tom Nolan, Chesterene Cwiklik, Lynn McIntyre, Donald Phillips, Michael James Grubb, and John Anthony Brown. Exhibit 141 was a much smaller chart, which summarized Edward M. Suzuki's testimony on trace evidence consisting of metal flakes and paint chips. The portion of his testimony relating to white paint chips was reflected on exhibit 143.

We begin our analysis by noting the unusual complexity of the scientific evidence in this case. During the 37 days of trial, the jury heard testimony from expert witnesses regarding trace evidence on all or part of 18 days. Testimony of the State's experts spanned 1,364 pages. Brown alone gave 539 pages of testimony over a period of 5 days. Dr. Suzuki's testimony filled 183 pages of trial transcript. Exhibit 143, which is the primary focus of Lord's challenge, was set out in the form of a grid. See appendix. Across the top, there were 30 categories of trace evidence. Down the left side, there were 25 items or locations where trace evidence was found. There were a total of 118 "dots" on the chart indicating some correlation between the specific trace evidence and items or location.

Trace evidence by its nature is not evidence which a jury can readily examine. Any conclusion to be drawn from the evidence of necessity required microscopic and

scientific testing. The jury could certainly view the evidence, but there was no way it could realistically compare, for example, one wood chip with another. Moreover, the evidence, if measured by the number of types of evidence and the number of items and locations, was voluminous. The transcript of trial testimony was 36 volumes and 5,674 pages long. The charts served to help the jury understand and organize factually complex evidence introduced by many witnesses during a lengthy trial.

Importantly, the jury was repeatedly made aware of the limits of the evidence reflected in the charts. Each expert was examined as to his or her qualifications, experience, methods, and the limits of the method of testing used. Cross examination of each of the experts was vigorous, and the trial judge allowed defense counsel wide latitude in scope and degree. It also appears that the trial court made every reasonable effort to ensure that the charts were substantially accurate. The court ruled that the charts could be modified to the extent they were inaccurate, took great care to ensure that defense counsel had full opportunity to make objections to the information on the charts before they were shown to the jury, and invited the defense to make its own chart. While the defense did not prepare a chart of its own, a number of changes were made to the State's charts both at Lord's request during expert testimony and in response to objections made before the jury saw the relevant portions of the charts.

During his testimony, Dr. Suzuki made a number of additions to exhibit 141 at Lord's request: He added the words "different microscopic appearances" and "different compositions" to the exhibit. He also wrote "2 fragments S-08 not received for analysis." Similarly, during his testimony, Dr. Brown made a number of changes and additions to exhibit 143, again at Lord's request. A dot for the broom was added under the #1 red paint category. The word "truck" was crossed out in the category "carpet fibers, truck" and "pale-brown nylon carpet fibers" was changed

to "brown nylon carpet fibers". A "royal-blue cotton fabric" category was added with dots added for the red sweatshirt and orange U-Haul blanket. The word "royal" was added to the category labeled "blue polo shirt". Three footnotes were added to exhibit 143: Footnote 1 indicated that Brown could not determine when orange fibers found on the blue U-Haul blanket and on a rope, which was in the blue pickup, had been deposited on those items. Footnote 2 indicated that there was a black undercoat on the paint samples taken from the truck. Footnote 3 indicated that the royal blue cotton fibers found were dissimilar from the control fibers taken from the royal blue polo shirt.

Changes were also made in response to defense objections prior to the jury seeing the relevant portions of the charts. On exhibit 143, the category labeled "presumptively blood" was changed to read "consistent with blood".[6] A "burnt fabric" category was deleted. The chart was changed to reflect that there were two fence paint samples, not one. Similarly, exhibit 141 was corrected regarding the location of metal fragments found near the workshop.

The trial court declined to make some of the requested changes. The court ruled that, contrary to Lord's assertion, the testimony did support the presence of wood chips in the autopsy clothes. Lord also objected to the categories of "coarse body hair (defendant)", which was related to the orange U-Haul blanket, and "coarse body hair", which was related to the towel. Lord objected to both categories on the basis that the description did not comport with testimony that the hair could be chest hair or pubic hair, more likely chest hair. The court ruled that it was not inconsistent with testimony that had been given and that Lord was free to cross-examine as to any dispute in the testimony.[7] These rulings are supported by the record.

---

[6]In identifying this category for the court, defense counsel specifically noted, but did not object to, the fact that the column had dots next to the shoes, door, floor, and hammer despite being asked if there were any other specific objections.

[7]Cindy Jay testified that she uses the term "coarse body hair" in connection with both chest hair and pubic hair.

Lord also objected to the word "defendant", on the basis that the testimony was that Lord could not be excluded as the source of the hair on the blanket. In response, the court ruled that because the issue of common source was the subject of dispute between the experts, it was "not inaccurate for [the category notation] to identify a hair as having come from the defendant when there was expert testimony on that fact." Furthermore, any possible prejudice from this evidence was eliminated by Lord's concession during closing argument that he had contact with the orange blanket. *Cf. United States v. Abbas*, 504 F.2d 123, 125-26 (9th Cir. 1974), *cert. denied*, 421 U.S. 988 (1975).

After determining that the charts were substantially accurate, the trial court admitted them as illustrative summaries with a limiting instruction:

> Exhibits Numbers 141 and 143 have been admitted in evidence. These exhibits have no independent existence or evidentiary value in and of themselves. The evidentiary value to be given these exhibits is entirely dependent upon the testimonial and/or documentary proof upon which they are based, and upon the accuracy and credibility of the testimonial and/or documentary proof upon which the exhibits are based. The exhibits are admitted to assist you in considering the evidence and for that purpose you are entitled to consider them.

Instruction 8.

We conclude that the admission of the charts for illustrative purposes was not an abuse of discretion. The charts were an appropriate and necessary aid to the jury in understanding and organizing the voluminous trace evidence. Without the aid of the charts, the State would have been severely hampered in the presentation of its case and, in effect, denied the use of legitimate and crucial scientific evidence. The jury was made well aware of the level of certainty the experts were able to testify to through lengthy and exhaustive cross examination. Defense counsel was given ample opportunity to make objections to disputed entries and chose not to present its own chart. Finally, a proper limiting instruction was

given. If we were to disallow the use of the summary chart, it would be difficult to conceive of the circumstances in which it would be permitted.

Turning to the trial court's decision to send the charts to the jury room, we noted earlier that generally charts should not be sent to the jury room. However, reversible error does not occur unless a review of the entire record establishes that Lord was prejudiced. *United States v. Abbas, supra; see also United States v. Cox*, 633 F.2d 871, 874 (9th Cir. 1980); *United States v. Krasn*, 614 F.2d 1229, 1238 (9th Cir. 1980). Prejudice resulting from sending a summary chart to the jury can be prevented by the same protective and precautionary procedures the trial court uses to ensure accuracy when considering admissibility. The court in *Abbas* simultaneously analyzed the admissibility of the charts and the possible prejudice from sending the charts to the jury. *Abbas*, at 125. In concluding that the defendant had not been prejudiced, the court there noted that the defense had an opportunity to cross-examine the witnesses relative to the charts, to correct any purported errors, and to present its own chart. *Abbas*, at 125. As noted above, the chart here was an accurate representation of evidence already before the jury.

To ensure that no prejudice resulted from the error, however, we must further ask if the chart unduly emphasized the State's case against Lord. For the following reasons, we find that it did not. First, the court properly instructed the jury that the charts had no evidentiary value of their own and were to be considered in light of the accuracy and credibility of the supporting testimony. The jury is presumed to have heeded the instructions of the court. *State v. Grisby*, 97 Wn.2d 493, 499, 647 P.2d 6 (1982), *cert. denied sub nom. Frazier v. Washington*, 459 U.S. 1211 (1983).

Second, after 18 days of expert testimony, the jurors were well aware that the conclusions to be drawn from the charts were subject to qualification. In addition to their recollection, jurors were allowed to take notes during the trial, to which they could refer during deliberations. The

jurors' notes, no doubt, supplemented and explained the expert testimony and further refined the chart.

Additionally, had the court allowed the State to present a chart, and then denied the defense the same opportunity, a stronger argument could be made that Lord had been prejudiced thereby. However, the court expressly allowed the defense to make its own chart. The defense did not present an alternative summary chart, but instead relied on the changes made to the charts admitted into evidence. Furthermore, the chart had been altered in response to defense requests and objections. Thus, Lord's denotations were preserved for the jury. The submission of the charts to the jury did not prevent the defendant from presenting any contradictory evidence. The charts, therefore, did not favor the State's case, but presented a balanced summary.

Finally, in assessing the prejudicial impact of any given item, it is necessary to view that evidence in the context of the entire trial. The State's case against Lord included his proximity to the victim in time and location, his prescient comments about her demise and whereabouts, his bizarre behavior in cleaning at the scene of the crime, his attempts to buy alibi witnesses, his incriminating statements to trusties, the contradictory statements to police officers, and the vast array of scientific evidence that inextricably linked Lord to the blue pickup, the shop, the clothes, the orange U-Haul blanket, and, ultimately, to Tracy's body. In addition, the trial judge made every possible effort to ensure that the charts were reliable and that the jurors understood the proper use of the charts. Based on our review of the record, we cannot say that allowing the charts to go to the jury room during deliberations unduly emphasized the State's case to Lord's prejudice.

■ Lord next argues that the admission of the charts violates Const. art. 4, § 16, which provides: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." The purpose of article 4, section 16 " 'is to prevent the jury from being influenced by knowledge conveyed to it by the court as to the court's opinion of the evidence submitted.' " *Seattle v.*

*Arensmeyer*, 6 Wn. App. 116, 120, 491 P.2d 1305 (1971) (quoting *Heitfeld v. Benevolent & Protective Order of Keglers*, 36 Wn.2d 685, 699, 220 P.2d 655, 18 A.L.R.2d 983 (1950)). For example, in *Arensmeyer*, the trial court's interruption of counsel during closing argument to say he was mistaken as to the evidence was an unconstitutional comment on the evidence. "To constitute a comment on the evidence, it must appear that the court's attitude toward the merits of the cause are reasonably inferable from the nature or manner of the court's statements." *State v. Carothers*, 84 Wn.2d 256, 267, 525 P.2d 731 (1974).

 Lord does not contend that the trial court made any statements in front of the jury regarding its opinion of the charts. Rather, Lord argues that the chart alone "transforms the expert testimony from its speculative form to absolute certainties." Brief of Appellant, at 81. He then concludes that the act of admitting the chart and sending it to the jury "subtly indicated to the jury that the State's witnesses were in fact credible and that the factual issue of common source [of the trace evidence] should be resolved in the State's favor." Brief of Appellant, at 82. We disagree. The extreme care which the trial judge used in dealing with exhibit 143 has already been discussed at length. Lord does not support his accusation of subtle influence with a single reference to the record. The trial court is charged with using its discretion to ensure that proper evidence is admitted and improper evidence is excluded. The admission of evidence, standing alone, cannot be considered an unconstitutional comment on the evidence.

### Internal Investigation

The conduct of Donald Phillips, a forensic scientist who had been employed as a supervisor of criminalistics at the crime lab during and after the murder investigation, is the subject of several errors alleged by Lord. The trial court ruled on a number of motions related to Phillips' testimony. We begin with a summary of these motions and the related facts.

Prior to trial, Lord moved to exclude any testimony by Phillips because he had not yet received a report from Phillips related to the investigation of the crime scene or been able to arrange an interview with Phillips. In response to Lord's motion, the court ordered that Phillips be deposed with both parties present.

During the deposition, Lord learned that Phillips had used leuco-malachite green to test for the presence of blood at Kirk Lord's workshop. On some items, he used a 2-step process where a colorless dye is applied, and then an oxidizing agent is applied in a separate step. On other items, Phillips used a 1-step method, where the dye and oxidizing agent are premixed and then applied by spraying the item being tested. The hammer, which the State submitted was the murder weapon, was tested using the latter method. Defense again moved to exclude Phillips' testimony contending that the 1-step method used by Phillips was not generally accepted within the scientific community.

As a result of Phillips' deposition, Lord became aware of an internal investigation by the crime lab of Phillips' conduct in connection with the murder investigation. Lord made an oral motion for production of the records related to the investigation, which the trial court granted. Upon receipt of a summary of the investigation materials, Lord moved for dismissal, a mistrial, or an order excluding the testimony of Phillips and detectives Hudson and Wright in connection with testing for blood at the workshop. Lord also requested an evidentiary hearing.

The court released notes and tapes of the interviews with crime lab personnel in connection with the internal investigation to both counsel and conducted an extensive evidentiary hearing regarding Phillips' activities and the internal investigation. The court then ordered the crime lab to provide both counsel copies of all the records and summaries of statements given concerning the investigation of Phillips, the notes of Brown and Sweeney, and the official written report, attached diagram, and notes submitted by Phillips.

The records released by the crime lab indicated that a complaint regarding Phillips' conduct during the homicide investigation was received on November 26, 1986. The complaint alleged that Phillips had used the 1-step method to test for blood at the workshop after Sweeney had instructed him to use a 2-step or drop method. The complaint further alleged that Phillips had lied by telling Sweeney he had used the drop method and had falsified his report to say that he had swabbed the hammer. The complaint went on to state that Phillips had asked detectives Wright and Hudson to indicate in their report that they — not Phillips — had found the hammer at the workshop. Finally, the complaint noted an odd occurrence where Phillips told a fellow employee that a vision or dream had revealed that the hammer was the murder weapon.

When Phillips learned he was being investigated, he went on 30-day sick leave and began taking medication, including antidepressants. Phillips resigned from the lab on December 26, 1986, before the investigation was completed.

The court denied Lord's motions, after specifically finding that there had been no misconduct on the part of either the prosecutor or the sheriff's office. The court went on to say that if any misconduct had occurred, it was within the lab and, thus, went only to credibility. In denying the motion, the court noted that defense counsel had never been misled by the false report because counsel knew from both the interviews with detectives Hudson and Wright, and from Phillips' deposition, that Phillips had used the 1-step method to test for blood at the workshop. Furthermore, Lord acquired abundant impeachment evidence through the hearing and crime lab investigation documents. The court concluded that there was insufficient prejudice to grant a mistrial or dismissal, or to suppress evidence; any prejudice had been cured by the discovery.

Turning to Lord's allegations, he first argues that the trial court erred in allowing Phillips to testify regarding the use of leuco-malachite green as a presumptive test for

blood.[8] He argues that Phillips' testimony regarding the testing at the workshop should have been excluded because the 1-step spray method Phillips used does not comport with the generally accepted standard in the scientific community. Before ruling on the admissibility of testimony on leuco-malachite green, the trial court heard testimony from John Thornton, Ph.D.

Thornton, Lord's own expert witness, testified that leuco-malachite green is a generally accepted presumptive test for blood and testified that both methods are used. He testified that while the 2-step method gives slightly more specificity than the 1-step method (because some false positives can be ruled out), both tests are presumptive, not conclusive, for the presence of blood. Thornton had reservations about the spraying method, which he believed was an "improvident" method of proceeding. However, he testified that the 1-step spray method is used when searching for blood where the area has been cleaned and there is no blood visible to the naked eye. Spraying is also appropriate when searching for a pattern of blood. He noted that the decision on how to proceed is a judgment call to be made by the investigator.

The jury heard considerable testimony on this subject from both Phillips and Thornton. The defense had adequate opportunity to cross-examine Phillips regarding his actions at the workshop. Thornton's rebuttal testimony spanned 32 pages. The trial court correctly concluded that

---

[8]Lord does not contend that Phillips lacks the qualifications to testify as an expert witness on the use of leuco-malachite green, nor that leuco-malachite green as a presumptive test for blood fails to satisfy the relevancy and reliability requirements of the *Frye* test.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

ER 702. Phillips testified as to his education, experience and training as a forensic scientist and crime scene investigator. The determination that a witness is properly qualified to express an opinion as an expert is within the sound discretion of the trial court. *State v. Nelson*, 72 Wn.2d 269, 276, 432 P.2d 857 (1967).

Lord's argument went to the weight, not the admissibility, of the evidence.

Lord next argues that his due process right to a fundamentally fair trial was violated by the admission of the hammer because Phillips sprayed it with leuco-malachite green, thereby precluding more specific testing. In effect, he claims that the State intentionally destroyed exculpatory evidence.

Under the due process clause of the Fourteenth Amendment,[9] it must be demonstrated that the State's prosecution of Lord comported with prevailing notions of fundamental fairness such that Lord was afforded a meaningful opportunity to present a complete defense. To ensure that Lord was given this opportunity, the prosecutor had a constitutional duty to give Lord any exculpatory evidence that would raise a reasonable doubt about his guilt. *California v. Trombetta*, 467 U.S. 479, 485, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984).

Specifically, Lord contends that, had Phillips used the 2-step swab method to test the hammer, additional tests could have been done to determine conclusively if there was blood on the hammer and, if so, whether it was Tracy's. If such tests had shown that the blood was not Tracy's, he further argues, a conviction would then have been highly unlikely. Because the opportunity to perform specific tests on the hammer was lost once it had been sprayed, Lord claims that Phillips' actions are tantamount to a failure by the State to preserve material exculpatory evidence. He concludes that he was thus denied a fair trial.

The argument Lord makes was rejected in *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988). In *Youngblood*, the defendant was convicted of child molestation and sexual assault. A sample collected from the victim was used to show that a sexual attack had occurred. Police procedure did not routinely require tests for blood grouping and none were performed.

---

[9]Lord does not raise a claim under the due process clause of the Washington Constitution, article 1, section 3. Thus, our discussion is limited to federal law. *See State v. Straka*, 116 Wn.2d 859, 883, 810 P.2d 888 (1991).

When the sample was again tested at a later date, the test failed to detect any blood group substances. The victim's clothes were also tested for semen more than 2 months after the attack. The clothes had not been refrigerated in the interim. They tested positive for semen, but testing for blood group typing was unsuccessful. The defendant claimed that his due process rights had been violated because, had the samples been tested shortly after they were gathered, or the clothes properly refrigerated, there might have been evidence eliminating him as the assailant. *Youngblood*, at 52-54.

In *Youngblood*, the Court found that no due process violation had occurred. The Court noted that if a due process claim is based on the State's failure to *disclose* material exculpatory evidence, good or bad faith on the part of the State is irrelevant. *Youngblood*, at 57 (citing *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963)). However, the Court distinguished cases where the State fails "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, at 57. *Youngblood* held that, absent bad faith, failure to preserve merely *potentially* useful evidence does not constitute a denial of due process of law. *Youngblood*, at 57-58.

Lord's contention should be analyzed using the rule set forth in *Youngblood*. Lord's claim that the hammer could have yielded more information is no different from the claim in *Youngblood*. The State failed to preserve potentially useful evidence that "could have been subjected to tests, the results of which might have exonerated" him. *Youngblood*, at 57. Thus, absent bad faith on the part of Phillips, there is no due process violation.

Although Lord characterizes the spraying of the hammer by Phillips as the "destruction" of evidence, there is no evidence that Phillips acted intentionally. The hammer was lying underneath the coiled extension cords and was sprayed inadvertently. Phillips did not see the hammer until after he sprayed the cords. When he realized what

he had done, Phillips unsuccessfully tried to save a sample for further testing by using a swab to take material from the claw of the hammer. Phillips' actions did not constitute bad faith.[10] Additionally, as in *Youngblood*, nothing about the State's handling of the hammer was concealed at trial, and the defense had access to the hammer for testing. *Youngblood*, at 58.

In addition, there was independent testimony connecting the hammer to the crime. Two detectives and Phillips all testified to seeing a positive reaction consistent with blood on the hammer. The medical examiner testified that Tracy's wounds could have been inflicted by a hammer. Lord was a carpenter who used tools at his brother's workshop. The hammer was properly admitted and no due process violation occurred.

Lord next claims that his due process right to a fair trial was violated when Phillips falsified the report he submitted to his supervisors. We disagree. As the trial court noted, Lord never relied on the false information in the report. He was aware from interviews with the detectives that the hammer had been sprayed. When he was deposed, Phillips truthfully stated that he had sprayed the hammer. Thus, the defense was not deliberately misled. Rather, Phillips' actions implicate his credibility as a witness. Because the evidentiary hearing provided Lord with a wealth of impeachment evidence against Phillips, in a sense, rather than denying Lord a fair trial, the false report actually assisted defense counsel's attempts to impeach his testimony.

Finally, Lord contends that the trial court improperly limited the scope of his cross examination of Phillips regarding any possible mental defects Phillips may have had and the statements Phillips made about a vision that the hammer was the murder weapon.

---

[10]Lord relies on *California v. Trombetta*, 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984) to argue that there was bad faith rising to the level of a due process violation. *Trombetta* is inapposite. Under *Trombetta*, for a violation of due process to be found, the evidence must possess an exculpatory value that was apparent before it was destroyed. *Trombetta*, at 489.

■■ Generally, cross examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. However, the court may permit inquiry into additional matters. ER 611(b). The scope of cross examination lies within the sound discretion of the trial court. ER 611(b); *State v. Hoffman*, 116 Wn.2d 51, 96, 804 P.2d 577 (1991). The trial court's ruling will not be disturbed on appeal unless no reasonable person would take the position adopted by the trial court. *State v. Rice*, 110 Wn.2d 577, 600, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989).

In denying Lord's motion in limine, the trial court ruled that Lord could not inquire if Phillips was under psychiatric care at the time of the homicide investigation. However, Lord could ask if Phillips was on medication during the relevant time. Lord agreed that inquiry was only relevant in relation to the use of medications. The court's ruling was correct.

The trial court also ruled that Lord could not inquire about the reference to a vision about the hammer. The court ruled that this statement was more unfairly prejudicial than probative given that Phillips had already admitted his mistake and falsification, and that Nolan had testified about the repeated testings at Phillips' request. We agree. In sum, the trial court did not abuse its discretion in limiting the scope of cross examination of Phillips.

## Autopsy Photographs

Lord assigns error to the admission of a number of color photographs taken of Tracy's head and skull during the autopsy. He contends they should have been excluded because they were so gruesome as to be unfairly prejudicial.

■ The admission of photographs is within the sound discretion of the trial court. *State v. Hoffman*, 116 Wn.2d 51, 88, 804 P.2d 577 (1991). Photographs have probative value where they are used to illustrate or explain the testimony of the pathologist performing the autopsy. *State*

*v. Jones*, 95 Wn.2d 616, 628, 628 P.2d 472 (1981). Gruesome photographs are admissible if the trial court finds their probative value outweighs their prejudicial effect. *Hoffman*, at 88; *State v. Harris*, 106 Wn.2d 784, 791, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987). " '[A] bloody, brutal crime cannot be explained to a jury in a lily-white manner' ". *State v. Crenshaw*, 98 Wn.2d 789, 807, 659 P.2d 488 (1983) (quoting *State v. Adams*, 76 Wn.2d 650, 656, 458 P.2d 558 (1969), *rev'd on other grounds*, 403 U.S. 947, 29 L. Ed. 2d 855, 91 S. Ct. 2273 (1971)). Here, while the admitted photographs can be considered gruesome, the trial judge clearly was aware of her need to exercise discretion. Although she admitted the photographs at issue, she excluded photographs of Tracy's skull that showed fractures. The exclusion of these exhibits was based on the court's conclusion that diagrams were sufficient to depict the fractures.

Admitted exhibits 26 through 31 are photographs of Tracy's head taken from a number of angles. Each photograph shows a different portion of Tracy's head and the injuries to those areas. During extensive voir dire in connection with an offer of proof, Dr. John Dale Howard, the medical examiner who performed the autopsy, testified that the photographs were taken at his direction to establish identity and to document any injuries pertinent to understanding the death. He testified further that the photographs would be helpful in explaining the nature and depth of injuries to the jury. In his opinion, the photographs were a more accurate representation of the injuries than a simple diagram. This was so because decomposition had altered the wounds. He believed that the jury would benefit from seeing those changes as well as the specific location, size, and nature of wounds. It was important for the jury to see the extent of the decomposition because the resulting alteration of the wounds limited the conclusions he was able to draw about the nature of the wounds.

Given the medical examiner's testimony that the photographs would aid the jury in understanding his testimony and were a more accurate representation of the injuries, we hold that the trial court did not abuse its discretion in admitting exhibits 26 through 31.

## Other Evidentiary Rulings

Lord also assigns error to the trial court's admission of the matchbook found in the blue truck, the photograph of the injury on his arm, and the evidence of his alcohol and marijuana use. We conclude that there was no abuse of discretion in the admission of this evidence.

As to the matchbook, Lord's objection was that it was not relevant because of the passage of time between September 16 and October 1, when the truck was impounded. The trial court correctly concluded that Lord's objection goes to weight, not relevancy.

The photograph of the injury on Lord's arm was properly admitted. While the photograph was taken a month after Tracy's disappearance, there was testimony that Lord had an injury on his arm the evening of September 16.

The evidence of Lord's alcohol and marijuana use was also properly admitted. Lord told Detective Magerstaedt that when he smoked marijuana and drank beer "he becomes a different person and he loses control." The trial court ruled on the admissibility of evidence of Lord's marijuana use under ER 404(b) and ER 403.[11] ER 404(b) was applicable because marijuana use constitutes a prior bad act. The court found that the evidence was admissible as an explanation for Lord's conduct, not to prove character.

---

[11]ER 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

ER 403 provides, in part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . .".

It pertained to intent, preparation, opportunity, and provided the jury a possible explanation for the commission of this crime. Under ER 403, the court concluded that the evidence was relevant because the proximity in time, coupled with Lord's own activities and statements, made the statements rationally and probatively related to the crime. Furthermore, any prejudicial aspects of the activity were neither particularly inflammatory nor similar to the crime at issue.

### Impeachment of Jail Trusties

Lord argues that the trial court erred by excluding the testimony of witnesses whom the defense intended to call to impeach Sonny Belgard and Rex Harvey, two prisoner trusties. Belgard and Harvey testified about incriminating statements Lord made to them while he was in the Kitsap County Jail awaiting trial. The defense offered witnesses to testify regarding Belgard's and Harvey's reputations for truthfulness.

ER 608(a) provides:

> The credibility of a witness may be attacked or supported by evidence in the form of reputation, but subject to the limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by reputation evidence or otherwise.

The application of ER 608(a) has been broken down into five elements:

> The first element is the foundation for the testimony — the knowledge of the reputation of the witness attacked. Second, the impeaching testimony must be limited to the witness's reputation for truth and veracity and may not relate to the witness's general, overall reputation. Third, the questions must be confined to the reputation of the witness in his community . . . Fourth, the reputation at issue must not be remote in time from the time of the trial. Finally, the belief of the witness must be based upon the reputation to which he has testified and not upon his individual opinion.

(Footnotes omitted.) 5A K. Tegland, Wash. Prac., *Evidence* § 231, at 202-04 (3d ed. 1989).

Lord offered three witnesses to testify regarding Belgard's reputation for truthfulness: Donna Lynch, Gayle Gordon, and Sarah Carlson. All three were community corrections officers. The trial court heard offers of proof regarding these witnesses. Lynch was excluded after she testified that she did not have an opinion as to Belgard's reputation for truth and honesty.

Gordon testified that she had had contact with Belgard's family, other correction personnel, judges, attorneys, and law enforcement personnel. Based on these contacts, she testified that Belgard does not have a good reputation for truth and honesty within the criminal justice system.

■ The trial court excluded Gordon's testimony for several reasons. First, as a community corrections officer, the only contacts she had with people who knew Belgard were with those who interacted with him as a result of his criminal convictions and with his family. The court ruled that these contacts were insufficient for her to have knowledge of his reputation in the community for truth and veracity. Moreover, through contacts with Belgard in the criminal justice system, Gordon formed an opinion about his criminal behavior, but not about a particular reputation for veracity. Finally, Gordon's testimony was too remote because she had had no contact with Belgard since he had been released from jail several months earlier.[12]

We agree that the criminal justice system does not constitute the community in which Belgard resides. This system is neither "neutral enough [n]or generalized enough to be classed as a community" and an officer in the criminal justice system is not equipped to provide an unbiased and reliable evaluation of an inmate's general reputation for truth telling. *Parker v. State*, 458 So. 2d 750, 753-54 (Fla. 1984), *sentence vacated on writ of habeas corpus, aff'd sub nom. Parker v. Dugger*, 876 F.2d 1470 (11th

---

[12]After the trial court ruled that Gordon's testimony was not admissible under ER 608, it also noted that the testimony would be excluded under ER 403 because "the nature of her contacts with him are strictly through his criminal behavior, which has already been delineated and is before the jury in its proper form."

Cir. 1989), *rev'd and remanded*, 111 S. Ct. 731 (1991). In *State v. Swenson*, 62 Wn.2d 259, 282-83, 382 P.2d 614 (1963), we held that a witness's reputation for truthfulness and veracity among people of her church did not satisfy the requirement that the offered testimony be limited to a general reputation for truth and veracity in the community in which she resided. Gordon's lack of knowledge of Belgard's reputation for truthfulness in the general community, coupled with the remoteness in time, support exclusion of Gordon's testimony.

Lord also offered the testimony of Carlson, who had supervised Belgard in a work release program. She testified that her opinion was based on contacts with Belgard's family, people in the court system, and people involved in monitoring his parole. She could not speak to his general reputation for truth and honesty and was aware of his reputation only with his family and herself.

The trial court excluded Carlson's testimony under ER 608. First, she was unable to testify to Belgard's general reputation for truthfulness. Second, even if the definition of general reputation could mean reputation among one's own family, Carlson was not competent to offer an opinion that Belgard was dishonest with his family. The trial court's rulings were correct.

Lord also sought to have Ronald Heeney testify as to Harvey's reputation for truthfulness. Harvey had several prior convictions for theft by color or aid of deception, all of which had been brought out during Harvey's testimony. Heeney was the victim of one of these crimes and had business dealings with Harvey in 1985. The trial court excluded Heeney's testimony because it was too remote in time and because he was "not able to testify that he knew Mr. Harvey's reputation for truth or honesty." The record supports this ruling. In sum, we find no abuse of discretion in the trial court's exclusion of these four witnesses.

### Instructions

Lord assigns error to instruction 13 and Verdict Form A-1, arguing that the jury was improperly allowed to

convict him without unanimously determining which underlying crime — rape or kidnapping — served to aggravate his offense. The State has the burden of proving beyond a reasonable doubt that a criminal defendant committed every act necessary to constitute the crime charged. *In re Winship*, 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970). Further, defendants in criminal trials may only be convicted by unanimous verdict. *State v. Mak*, 105 Wn.2d 692, 735, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991).

Instruction 13 provided:

### NO. 13

If, and only if, you find the defendant guilty of Premeditated First Degree Murder as set forth as Alternative A, Premeditated First Degree Murder, in instruction No. 12 then it will be necessary for you to return a special verdict to the following question:

Did the State prove beyond a reasonable doubt that one or more of the following aggravated circumstances existed?

(a) The murder was committed to conceal the commission of the crime of *First Degree Rape or Second Degree Rape or the Crime of First Degree Kidnapping or Second Degree Kidnapping*; or

(b) The murder was committed to conceal the commission of the crime of *attempted First Degree Rape or attempted Second Degree Rape or the crime of attempted First Degree Kidnapping or attempted Second Degree Kidnapping*; or

(c) The murder was committed to protect or conceal the identity of any person committing the crime of *First Degree Rape or Second Degree Rape or the crime of First Degree Kidnapping or Second Degree Kidnapping*; or

(d) The murder was committed to protect or conceal the identity of any person committing the crime of *attempted First Degree Rape or attempted Second Degree Rape or the crime of attempted First Degree Kidnapping or attempted Second Degree Kidnapping*; or

(e) The murder was committed in the course of or in immediate flight from the crime of *First Degree Rape or Second Degree Rape or the crime of First Degree Kidnapping*.

The State must prove to you beyond a reasonable doubt, as previously defined, one or more of the aggravating circumstances. These aggravating circumstances are alternatives and only one need be proved. You must unanimously agree

upon which, if any, of the aggravating circumstances set forth before has been proved. You will be provided with a special verdict form for each aggravating circumstance in which you answer yes or no according to the decision you reach.

If after fully and fairly considering all of the evidence or lack of evidence you are not able to reach a unanimous decision as to any element of any one of the aggravating circumstances, do not fill in the blank for that alternative.

(Italics ours.)

Special Verdict Form A-1 provided:

### SPECIAL VERDICT FORM A-1

We, the jury, return a special verdict by answering as follows:

(a) Did the Defendant, BRIAN KEITH LORD, commit the murder to conceal the commission of the crime of *First Degree Rape or Second Degree Rape or the crime of First Degree Kidnapping or Second Degree Kidnapping*?

ANSWER: _____Yes_____
(write in "yes" or "no")

(b) Did the defendant, BRIAN KEITH LORD, commit the murder to conceal the commission of the crime of *attempted First Degree Rape or attempted Second Degree Rape or the crime of attempted First Degree Kidnapping or attempted Second Degree Kidnapping*?

ANSWER: _____
(write in "yes" or "no")

(c) Did the defendant, BRIAN KEITH LORD, commit the murder to protect or conceal the identity of any person committing the crime of *First Degree Rape or Second Degree Rape, or the crime of First Degree Kidnapping or Second Degree Kidnapping*?

ANSWER: _____Yes_____
(write in "yes" or "no")

(d) Did the defendant, BRIAN KEITH LORD, commit the murder to protect or conceal the identity of any person committing the crime of *attempted First Degree Rape or the crime of attempted Second Degree Rape or the crime of attempted First Degree Kidnapping or attempted Second Degree Kidnapping*?

ANSWER: _____
(write in "yes" or "no")

(e) Did the defendant, BRIAN KEITH LORD, commit the murder in the course of, or in immediate flight from

the crime of *Rape in the First Degree or Rape in the Second Degree or Kidnapping in the First Degree?*
ANSWER: _____Yes_____
 (write in "yes" or "no")
Dated this __18_ day of ___July___, 1987.
 ___/s/ Gervais Crawford____
 FOREMAN

(Italics ours.)

 Each of the alternatives set out in both instruction 13 and Special Verdict Form A-1 allowed the jury to find that either rape *or* kidnapping was the underlying crime. Because neither required the jury to unanimously agree as to which underlying crime — rape, or kidnapping, or both — was committed, the instruction was incomplete. However, the omission was cured by a preceding instruction and its related verdict form. Instruction 12 provided:

### NO. 12

To convict the defendant of the crime of Murder in the First Degree, *each of the following elements of the crime must be proved beyond a reasonable doubt*:
(Alternative A) Premeditated Murder in the First Degree
 (1) That on or about the 16th day of September, 1986, the defendant caused the death of Tracy Parker;
 (2) That the defendant acted with intent to cause the death of Tracy Parker;
 (3) That the intent to cause the death was premeditated;
 (4) That Tracy Parker died as a result of defendant's acts; and
 (5) That the acts occurred in Kitsap County, Washington;
OR
(Alternative B) Felony Murder in the First Degree
 (1) That on or about the 16th day of September, 1986, Tracy Parker was killed;
 (2) That the defendant was committing or attempting to commit *Rape in the First Degree or Rape in the Second Degree*;
 (3) That the defendant caused the death of Tracy Parker in the course of and in furtherance of such crime or in immediate flight from such crime;
 (4) That Tracy Parker was not a participant in the crime; and
 (5) That the acts which caused the death of the decedent occurred in Kitsap County, Washington;
OR
(Alternative C) Felony Murder in the First Degree

(1) That on or about the 16th day of September, 1986, Tracy Parker was killed;

(2) That the defendant was committing or attempting to commit *Kidnapping in the First Degree or Kidnapping in the Second Degree*;

(3) That the defendant caused the death of Tracy Parker in the course of and in furtherance of such crime or in the immediate flight from such crime;

(4) That Tracy Parker was not a participant in the crime; and

(5) That the acts which caused the death of the decedent occurred in Kitsap County, Washington.

If you find from the evidence that each of the elements in Alternative A or each of the elements in Alternative B, or each of the elements in Alternative C, has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. All of the elements of only one alternative need be proved. *You must unanimously agree as to which one or more of the alternatives, A, B, or C, has been proved beyond a reasonable doubt.*

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of the elements in Alternative A, and as to any one of the elements in Alternative B, and as to any of the elements in Alternative C, then it will be your duty to return a verdict of not guilty.

(Italics ours.)

Verdict Form A provided:

VERDICT FORM A
We, the jury, find the defendant, BRIAN KEITH LORD, ___Guilty___ of the crime of Murder in the First (Guilty or Not Guilty) Degree, as charged.
The jurors found:
Alternative A, Premeditated First Degree Murder __Yes__
 Write in "yes" or "no"
Alternative B, Felony First Degree Murder __Yes__
 Write in "yes" or "no"
Alternative C, Felony First Degree Murder __Yes__
 Write in "yes" or "no"
 __/s/ Gervais Crawford__
 FOREMAN
If, and only if, the Jury found the defendant guilty of Alternative A then answer the questions on Special Verdict Form A-1.

Instruction 12 and Verdict Form A required the jury to consider Alternative B (rape) and Alternative C (kidnapping) separately, and to determine if all of the elements of

each crime were proven. As is clearly demonstrated by the affirmative responses to Alternatives B and C on Verdict Form A, the jury unanimously agreed that Lord was guilty of rape *and* of kidnapping. Thus, any error resulting from instruction 13 was cured by instruction 12 and Verdict Form A.

Lord next contends that several of the jury instructions during both the guilt and penalty phases of the trial were too complex for the jury to understand. This contention is based on the use of a computer program that ostensibly analyzes written information for comprehensibility. No objection was made on this basis at trial, nor was the computer program and related analysis offered for admission at trial. Thus, not only was the issue omitted below, but also it is based on evidence not contained in the record.

We decline to reach this issue because it is not based on a "manifest error affecting a constitutional right". RAP 2.5(a)(3). First, not all instructional errors are of constitutional magnitude. Neither the failure to instruct on lesser included offenses, the failure to define individual terms in instructions, nor the failure to define technical terms in instructions are errors of constitutional magnitude. *State v. Scott*, 110 Wn.2d 682, 688 n.5, 689, 757 P.2d 492 (1988). Second, "[t]he requirements of due process usually are met when the jury is informed of all the elements of an offense and instructed that unless each element is established beyond a reasonable doubt the defendant must be acquitted." *Scott*, at 690.

While we do not question that jury instructions in any death penalty case are complicated and lengthy, it is out of an abundance of caution for the defendant's rights that we are so precise. The argument discussed above regarding jury unanimity is graphic evidence of the need for detailed instructions. Precision necessarily entails complexity. We cannot fault trial judges for failing to carefully instruct a jury, and then find error because the instructions are too complicated. The complex nature of the jury instructions is not, in and of itself, an instruc-

tional error of constitutional magnitude warranting review for the first time on appeal.[13]

### Sufficiency of the Evidence

Lord contends that the evidence was insufficient to convict him of aggravated first degree murder. He first argues that the evidence is insufficient to prove that he was the perpetrator, and second, that the evidence is insufficient to support the underlying crimes of rape and kidnapping.

When a sufficiency challenge is raised, the question to be considered is if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jeffries*, 105 Wn.2d 398, 407, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986); *State v. Guloy*, 104 Wn.2d 412, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). Because the underlying facts were set forth in considerable detail at the beginning of this opinion, we need not repeat them here.

Lord first argues that the evidence is insufficient to prove that he was the perpetrator because it would have been difficult, if not impossible, for him to talk Tracy into a ride, rape her, murder her and dispose of the body and the clothes within the theorized time frame. We disagree.

Because Tracy previously had asked Lord for rides when she was late getting home, the evidence does not support Lord's contention that he needed time to persuade her to ride with him. Similarly, the evidence does not require the inference that Lord had to dispose of both the clothes and the body during the same time frame. Don

---

[13]While we do not reach this issue, we note that the instructions given in the penalty phase, with the exception of minor word changes and a change in instruction 5 made at Lord's request, parallel the instructions upheld against a number of challenges in *State v. Mak*, 105 Wn.2d 692, 750-53, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991). Indeed, when asked by the court if he had any exceptions to the instructions, Lord indicated that they were the appropriate instructions in light of *Mak*.

Because we decline to review this claim, Lord's motion to supplement the record with the computer program and related analysis is denied.

Carroll was never asked if he saw the clothes. Neither the Carrolls nor Kirk entered the workshop that evening. Indeed, Lord asked Don Carroll not to go into the workshop. The evidence does not lead to the inference that the clothes were not in the car, the workshop or elsewhere in the general vicinity.

Furthermore, the timing and travel measurements were approximations, not rigid determinations. The driving time calculations were based on someone driving at the posted speed limit. At 8 p.m., Tracy was already late getting home. Lord was late to a dinner party at his own apartment. And, most significantly, Don Carroll testified that Lord arrived at the workshop driving "[p]retty fast", despite the fact that the truck was smoking and steaming because of a defective gasket. The evidence supports the inference that Lord was driving faster than the posted limits that evening. In viewing all inferences most favorable to the State, the record shows that it was possible for Lord to accomplish the crime within the time limits suggested by the evidence.

Lord also argues that there is insufficient evidence to support his conviction for first degree murder because, in his words, there is unexplained evidence that is incompatible with his guilt. To the extent that this argument is based upon evidence not in the record, and never offered for inclusion in the record, it is without merit. As to evidence in the record which Lord contends raises questions about his guilt, we conclude that the inferences he draws are not compelling in light of the totality of the record.

Our review of the entire record establishes that, when viewed in the light most favorable to the State, the record reflects sufficient evidence to convict Lord of first degree murder.

Lord also challenges the sufficiency of the evidence supporting the aggravating factors of rape and kidnapping. Viewing the evidence in the light most favorable to the State, any rational trier of fact could have found that Tracy had been rendered unconscious, or at least unable to resist, and then been raped. The evidence was suffi-

cient to establish rape as an aggravating factor supporting Lord's aggravated first degree murder conviction. Accordingly, we need not inquire further as to if the evidence was also sufficient to establish kidnapping.

## Ineffective Assistance of Counsel

██ ██ Lord contends that he was denied effective assistance of counsel. The test to determine when a defendant's conviction must be overturned for ineffective assistance of counsel was set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984) and adopted by this court in *State v. Jeffries*, 105 Wn.2d 398, 418, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

If defense counsel's trial conduct can be characterized as legitimate trial strategy or tactics, then it cannot serve as a basis for a claim that the defendant did not receive effective assistance of counsel. *State v. Adams*, 91 Wn.2d 86, 90, 586 P.2d 1168 (1978). There is a strong presumption that counsel have rendered adequate assistance and made all significant decisions in the exercise of reasonably professional judgment such that their conduct falls within the wide range of reasonable professional assistance. The reasonableness of counsel's challenged conduct must be viewed in light of all of the circumstances, on the facts of the particular case as of the time of counsel's conduct. *Strickland*, at 689-90.

██ Under the prejudice aspect, "[t]he defendant must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* at 694. Because Lord must prove both ineffective assistance of counsel and resulting prejudice, the issue may be resolved upon a finding of lack of prejudice without determining if counsel's performance was deficient. *Strickland,* at 697.

Lord contends that he received ineffective assistance of counsel because his trial attorneys did not adequately investigate and prepare the case, and because they made various trial decisions and arguments that did not meet a minimum degree of competence. However, assuming, arguendo, that trial counsel's performance was deficient, Lord has failed to meet his burden of establishing prejudice.

First, Lord argues that trial counsel failed to pursue easily obtainable evidence concerning the number of matchbooks available in Kitsap County similar to the two admitted as evidence.[14] It can be assumed that the jury was aware that matchbooks are a common item and that there was a likelihood that other similar matchbooks existed. The number of matchbooks distributed in the area does not diminish the probative value of the matchbooks admitted into evidence. Moreover, the matchbook evidence was only a minute piece of the picture relied upon to establish a connection between Lord and the pile of clothing found near Island Lake.

Second, Lord alleges prejudice from his trial counsel's failure to call witnesses who claimed to have seen the victim the day after she was killed.[15] However, the State produced evidence that the victim's sister, whose appearance was very similar to Tracy's, had been out searching for her sister and could have been mistaken for her. More-

---

[14]On appeal, Lord moved to supplement the record with evidence of the number of similar matchbooks distributed in Kitsap County and surrounding areas. This motion is denied.

[15]Lord's entire argument consists of the following: "Second, the defense did not produce the testimony of witnesses who saw Tracy alive the next day." Brief of Appellant, at 145.

over, there was also testimony that Tracy was not in school on September 17. Lord has not established that there is a reasonable probability that the testimony of these witnesses would have affected the outcome of the trial.

Third, Lord claims that trial counsel did not present demonstrative evidence illustrating the shortcomings of the State's case. He argues that a chart showing deficiencies in the State's case would have diffused its strength. However, trial counsel vigorously cross-examined the State's expert witnesses concerning the contents of the summary charts and the limitations of the testing of trace evidence. A number of corrections were made to the charts as a result of defense objections. Trial counsel brought out perceived deficiencies and inconsistencies in the State's case during closing argument. A chart of unconnected trace evidence would have been of questionable value. Lord also argues that counsel should have made a time line chart to establish that he did not have time to commit the crimes charged. However, trial counsel did refer to the time line produced and used by the State during closing argument.

Fourth, Lord argues that trial counsel should have discovered Phillips' falsehoods sooner. As already noted, trial counsel never relied on the false report, and when it became known, counsel had access to voluminous impeachment evidence against Phillips. He was cross-examined vigorously about this issue.

As to Lord's remaining claims, he himself acknowledges that they can be categorized as "tactical judgments". Brief of Appellant, at 146. Essentially, Lord argues that no competent counsel would delay opening statement until after the victim's mother testified. Further, he alleges that the closing argument was without "real content, organization or persuasive ability." Brief of Appellant, at 146. Neither the opening statement nor closing argument are evidence to be considered by the jury. Moreover, a review of the record leads us to the conclusion that the opening statement and closing argument fall within the purview of tactical judgments and are not to be second-guessed by this court.

In sum, Lord has failed to meet his burden of showing that he was prejudiced by the alleged ineffective assistance of trial counsel.

### Ex Parte Conduct

Lord next contends that his conviction must be reversed because his right to a fair trial was denied by prosecutorial conduct. He claims that the prosecuting attorney, C. Danny Clem, engaged in improper ex parte contact in violation of RPC 4.2 by exchanging vulgarities with him during trial.[16] Lord submitted an affidavit to the trial court alleging that the prosecutor called him derogatory names and made disparaging comments about him. Lord corroborates these stories with a newspaper account of Clem's statements to the Rotary Club after the trial.[17]

Although Lord did not report the alleged incidents to his counsel during trial, he contends that it is "likely that the jury observed" the exchanges. There is nothing in the record which supports his contention. Both of the prosecutors submitted affidavits stating that there were no exchanges between Clem and Lord "in the presence of the jury". Neither of Lord's trial attorneys submitted affidavits in support of this motion.

Lord brought a posttrial motion requesting a new trial and a fact-finding hearing to determine if the jury had observed any contact between Lord and the prosecutor. The trial court found that a hearing was unnecessary and denied the motion because, even presuming that Lord's allegations were true, the alleged misconduct would not rise to the level of requiring a new trial.[18] In reaching this conclusion, the court considered:

---

[16]RPC 4.2 provides: "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

[17]The newspaper article is not in the clerk's papers.

[18]While Lord assigns error to the trial court's denial of his motion for a fact-finding hearing, he offers no argument in support of this assignment of error.

that there were two and-a-half months of trial, that there was overwhelming evidence supporting the conviction of the defendant, [and] that there was more than adequate evidence presented in the penalty phase for the jury to have arrived at the decision to apply the death penalty . . .

■■ Lord relies on the Rules of Professional Conduct (RPC) to support his allegation of prosecutorial misconduct which, he argues, requires reversal. However, the remedy for a claimed violation of the RPC is a request for discipline by the bar association. In the context of a criminal trial, Lord's allegation of prosecutorial misconduct is reviewed under applicable case law.

■■ ■■ The granting of a new trial based on allegations of prosecutorial misconduct is within the sound discretion of the trial court. *State v. Carr*, 13 Wn. App. 704, 709, 537 P.2d 844 (1975). A new trial should be granted only if the defendant's right to a fair trial was prejudiced. The trial court is in the best position to most effectively determine if prosecutorial misconduct prejudiced a defendant's right to a fair trial. *Carr*, at 709. Furthermore, Lord's conviction must be reversed only if there is a substantial likelihood that the alleged prosecutorial misconduct affected the verdict. *State v. Wood*, 44 Wn. App. 139, 145, 721 P.2d 541, *review denied*, 107 Wn.2d 1011 (1986).

Based on the record before us, we conclude that the trial court did not abuse its discretion in denying Lord's motion. Additionally, we cannot conclude that there is a substantial likelihood that the jury observed the alleged exchanges, much less that it affected the verdict. Accordingly, Lord's claim of prosecutorial misconduct does not require reversal. Having found no reversible error during the guilt phase, we turn now to the penalty phase of Lord's trial.

## PENALTY PHASE

Whenever the State requests the death penalty, a special sentencing proceeding is held. RCW 10.95.050. After hearing evidence and argument, the jury deliberates and returns an answer to the following question:

"Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"

RCW 10.95.060(4). The jury is then instructed that an affirmative answer must be unanimous. If the question is answered in the affirmative, the defendant is sentenced to death. RCW 10.95.080. The jury in the present case found that there were not sufficient mitigating circumstances to merit leniency.

### Heightened Scrutiny

 Lord raises a number of issues based on alleged constitutional and procedural errors in the penalty phase of his trial. Because the death penalty qualitatively differs from all other punishments, there must be reliability in the determination that death is the appropriate punishment. *Johnson v. Mississippi*, 486 U.S. 578, 584, 100 L. Ed. 2d 575, 108 S. Ct. 1981 (1988); *State v. Bartholomew*, 101 Wn.2d 631, 638, 683 P.2d 1079 (1984) (citing *Gardner v. Florida*, 430 U.S. 349, 51 L. Ed. 2d 393, 97 S. Ct. 1197 (1977)). Thus, capital sentencing determinations are subjected to a correspondingly higher degree of scrutiny than sentencing in noncapital cases.[19] *Caldwell v. Mississippi*, 472 U.S. 320, 329, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985).

However, heightened scrutiny means just that: a closer, more careful review of the record. Heightened scrutiny does not raise the standard of review. For example, in reviewing a challenge to an evidentiary ruling by the trial court, we still employ the abuse of discretion standard in the penalty phase. We will, however, more carefully review the factual basis upon which the trial court relied to ensure that the ruling complies with that standard.

---

[19]The dissent implies that heightened scrutiny is to be utilized in review of the guilt phase as well as the sentencing phase. Dissent, at 925. We disagree. Heightened scrutiny applies only to the penalty phase.

## Scope of Cross Examination

Lord claims that, during the cross examination of his father, Leslie Lord, the State improperly elicited evidence of crimes with which Lord had not been charged in violation of *State v. Bartholomew*, 98 Wn.2d 173, 654 P.2d 1170 (1982) (*Bartholomew* I), *State's cert. granted and remanded*, 463 U.S. 1203, *defendant's cert. denied*, 463 U.S. 1212 (1983), *reaff'd on remand*, 101 Wn.2d 631, 683 P.2d 1079 (1984) (*Bartholomew* II).[20] He contends that the admission of this evidence denied him his due process right to a fair trial.

Lord argues that *Bartholomew* "unequivocally prohibits the use of evidence relating to uncharged crimes." Reply Brief of Appellant, at 33. He mischaracterizes the holding of that case. *Bartholomew* I and II held that, because of its unreliability, evidence of uncharged crimes is not permitted in the State's case in chief. *Bartholomew* II, at 641 (quoting *Bartholomew* I, at 196-97). There, the evidence of uncharged crimes was presented through the State's witnesses. *Bartholomew* I, at 179. In fact, Lord does not dispute that the State properly introduced evidence of his prior convictions in its case in the sentencing phase. Two exhibits were submitted to the jury as evidence of Lord's conviction for unlawful imprisonment and his conviction for second degree murder. No other evidence was presented by the State.

Essentially, Lord is attempting to extend the rule announced in *Bartholomew* to the cross examination and rebuttal stages of the penalty phase. There is no authority

---

[20]*Bartholomew* I held that the admission of uncharged crimes violated the Eighth Amendment. *Bartholomew* I, 98 Wn.2d at 199. The United States Supreme Court granted certiorari, and then vacated and remanded *Bartholomew* for reconsideration in light of *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983). This court reaffirmed the original holding in its entirety based on both federal and independent state grounds under article 1, sections 3 (due process) and 14 (cruel punishment) of the Washington State Constitution. *Bartholomew* II, at 644.

for this extension, and we decline to create any. To the contrary, *Bartholomew* II specifically noted the admissibility of rebuttal evidence:

> In our opinion, the prosecution should be entitled to produce information necessary to rebut mitigating evidence produced by defendant.

*Bartholomew* II, at 642 (quoting *Bartholomew* I, at 197). The general rule, then, provides as follows:

> Specifically, evidence of nonstatutory aggravating factors must be limited to defendant's criminal record, evidence that would have been admissible at the guilt phase, *and evidence to rebut matters raised in mitigation by the defendant.*

(Italics ours.) *Bartholomew* II, at 642.

Thus, when the defendant presents evidence of mitigating circumstances, the prosecution is not restricted to the record of convictions. The State is entitled to cross-examine defense witnesses and introduce relevant evidence to rebut defendant's evidence so that the jury receives a balanced and complete picture. Lord's argument that the State should not be allowed to test the allegations of defense mitigation witnesses was specifically rejected in *Bartholomew* I:

> Unless the prosecution is permitted to test the reliability of defendant's evidence or attempt to rebut it, the jury may well approach the crucial sentencing decision from a distorted perspective. Such distortion could lead to arbitrary sentencing of the kind struck down in *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972). For these reasons, we hold that the prosecution should be entitled to produce evidence to rebut mitigating evidence produced by defendant.

*Bartholomew* I, at 197-98. As is the case in most evidentiary questions, the reliability of the evidence is crucial. In *Bartholomew*, we emphasized that objective, reliable evidence was admissible because of its value to the jury. *Bartholomew* I, at 196. As the reliability of the questioned evidence is enhanced, the prejudice — as that term is used here — is diminished.

██ Under *Bartholomew* II, the trial court must, therefore, employ a balancing test to determine the proper

scope of cross examination or the admissibility of rebuttal evidence:

> The court must balance the extent to which the evidence tends to rebut defendant's mitigating information against the extent to which the evidence is otherwise prejudicial to defendant. Only if the rebuttal value of the evidence outweighs the prejudicial effect should the evidence be admitted.

*Bartholomew* II, at 643 (quoting *Bartholomew* I, at 198). The *Bartholomew* test essentially restates ER 403, which provides, in part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . ." In this context, we are concerned with the probativeness of the testimony on cross examination: its "rebuttal value". Although this test was set forth in dicta in *Bartholomew* I and II, we are convinced that it may be a useful rephrasing of ER 403, and we hereby adopt its language.

This rule is analogous to the rules of evidence concerning testimony about defendant's character. Character evidence may be refuted on cross examination of defense witnesses under ER 405(a):

> In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation. On cross examination, inquiry is allowable into relevant specific instances of conduct.

When a defendant presents evidence of his character, the State may inquire further to determine the reliability of that evidence. A defendant's character witness may be cross-examined about his personal knowledge of specific incidents of misconduct. *State v. Styles*, 93 Wn.2d 173, 175, 606 P.2d 1233 (1980) (quoting *State v. Donaldson*, 76 Wn.2d 513, 518, 458 P.2d 21 (1969)); 5 K. Tegland, Wash. Prac., *Evidence* § 125, at 451 (3d ed. 1989). The broad scope of this rule is explained by one commentator as follows:

> The scope of cross-examination is sufficiently broad to make it dangerous for the defendant to call character witnesses unless the defendant has led a good life. A character

witness may not only be asked whether he "has heard" this or that about the defendant, but he may also be asked "Do you know" this or that about the defendant.

(Footnote omitted.) 5 K. Tegland, at 450. In *Styles*, we reaffirmed the continuing vitality of this rule.[21]

In sum, defense witnesses may be cross-examined concerning anything relevant to a matter raised in mitigation by the defendant, subject to the balancing test. *Bartholomew* II, at 642-43 (citing *Bartholomew* I, 98 Wn.2d at 197-98). The use of the rules of evidence in this context serves to enhance the truth-finding process which is the touchstone of criminal law.

We now apply these principles to the specific evidentiary matters to which Lord assigns error.[22] In mitigation, the defense called a number of witnesses, including Lord's family members, friends, and a psychologist. Lord's father, Leslie, testified about Lord's childhood activities, the family relationship, and Lord's skill as a carpenter. In addition, the defense brought forth testimony about the circumstances surrounding Lord's prior convictions. Leslie was questioned about Lord's attitudes and actions at the time of both crimes. The following exchange took place:

Q: Could you describe for this jury what type of child Keith was [at the time of the second degree murder]?

A: He was a good boy, a loving kid and just a real good kid. I was proud of him to have him for my son. He was a great — I mean he just loved all the family like we love him. We're a real close family.

Defense counsel concluded by asking:

Q: Les, do you know what Keith has been convicted of?

A: Yes, I do.

---

[21] The primary purpose of cross examination must be to impeach the defense witness, not to vilify the defendant's character. *Styles*, at 176. Because this distinction may be a fine one, it is best left to the trial court to evaluate the prosecution's motives during cross examination. The trial court must determine the good faith of the State, and if the questioning was allowed, we review only for an abuse of discretion. Absent a manifest abuse of discretion, the ruling of the trial court will not be disturbed. *Styles*, at 176-77.

[22] We note that Lord mischaracterizes the evidence he challenges as "uncharged crimes". The disputed evidence relates only to certain circumstances of the crimes which were properly before the jury.

Q: You know what his past is, don't you?
A: Yes.
Q: How do you feel about him now?
A: I love him dearly. I love him. He's a good boy.

During the State's cross examination, Leslie admitted that Lord had violated conditions of his probation from the second degree murder conviction by dropping out of school and committing two traffic offenses. He also acknowledged that the victim of the unlawful imprisonment was Lord's sister-in-law at the time of the offense. He testified that he did not know how old she was. When asked if she was 14, he replied: "Somewhere in that age. I don't know her age." The defense made no objections during this testimony.

Leslie also admitted that the victim had been in the hospital because of injuries inflicted by Lord and that Lord fled from police before being arrested. The prosecutor concluded by asking Leslie if he thought Lord was still a good boy after being convicted of murder and violating the conditions of his probation. Leslie reiterated that he did think Lord was a good boy.

Lord claims that the trial court improperly allowed testimony that the victim was assaulted in the course of the unlawful imprisonment. There was no such evidence. The defense objection made when the question was asked was sustained. Leslie's only testimony, over a defense objection, was that the victim was injured by Lord. However, this cannot be characterized as evidence of an uncharged crime, nor as unfairly prejudicial. In the State's case in chief, the jury was told that Lord's conviction for unlawful imprisonment was "effected by violence, menace, fraud, and deceit". State's exhibit 2. The infliction of injuries is inherent in a crime committed by violence.

Lord next claims that the trial court improperly allowed testimony that he had fled from police and violated his probation. To determine if this questioning was proper, we apply the balancing test. Lord chose to present testimony in mitigation about circumstances surrounding

the prior murder and unlawful imprisonment. Furthermore, Leslie testified twice on direct that Lord was a "good boy". He referred to his opinion of Lord both at the time of the second degree murder and now. The testimony that Lord had failed to follow the terms of his probation and had eluded police expanded on the testimony presented and directly rebutted the evidence of good character offered by Lord's father. The recounting of specific incidents to impeach defendant's witness is appropriate. In this setting, it was particularly so, since it indicated that Leslie's opinion of Lord was unchanged by the knowledge of his criminal behavior. Unless the prosecution is permitted to rebut defendant's evidence, the jury may well approach the crucial sentencing decision with an incomplete picture. *Bartholomew* I, at 197.

Moreover, any prejudice resulting from testimony that Lord dropped out of school and had two traffic violations, or even that he fled police, is insignificant given that the jury was properly aware of both of Lord's prior convictions for violent crimes. Indeed, the single most potentially prejudicial aspect of the evidence in the penalty phase was the second degree murder of a family friend. In sum, the prejudicial effect of the challenged testimony was minimal, and was clearly outweighed by the probative value of the rebuttal evidence. The testimony concerning Lord's probation violations and flight from the police was necessary to give the jury a complete picture of Lord. It was properly admitted under *Bartholomew*.

Finally, Lord argues that the age of the victim in the unlawful imprisonment case was improperly elicited.[23] No

---

[23]To clarify the record, there was no testimony that the victim was 14. Leslie's only testimony as to her age was that she was a teenager and somewhere around 14. When Lord's older sister was asked on cross examination if she knew how old the victim was at the time of the unlawful imprisonment, she said she did not know. She did, however, respond affirmatively when asked if the victim was a teenager at that time. The jury was instructed to rely only on the testimony and evidence as given by the witnesses, and we presume that it followed all instructions. *State v. Grisby*, 97 Wn.2d 493, 499, 647 P.2d 6 (1982), *cert. denied sub nom. Frazier v. Washington*, 459 U.S. 1211 (1983).

objection was made during cross examination regarding this testimony. A claim of manifest error affecting a constitutional right may, however, be raised for the first time on appeal. *State v. Hieb*, 107 Wn.2d 97, 108, 727 P.2d 239 (1986); RAP 2.5(a)(3). Lord asserts that the admission of the victim's age was so prejudicial as to be violative of his due process right to a fair trial. We disagree.

Lord's argument focuses on one relatively insignificant fact — the age of the victim — as being prejudicial and ignores the impact of other aspects of the imprisonment which he cannot properly contest. Lord's prior conviction involved a violent attack of a woman whom he held by use of violence, menace, fraud, and deceit. When viewed in the context of the entire crime, we do not believe that her status as a teenager was unfairly prejudicial to the defendant.

Additionally, though Lord makes a generic due process claim, he does not specify how the age of the victim especially prejudiced him and, thus, was constitutional error. In the absence of prejudice, Lord has failed to show that the claimed error was of constitutional magnitude, and so we need not review. *See State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988).

It is important to keep in mind the context in which these allegations of prejudice are made. In addition to the violent and premeditated murder which the jury re-lived during the guilt phase, the jury learned of Lord's 1975 conviction for second degree murder of a female family friend, and the brutal circumstances of that crime — the victim was shot with two guns by Lord and was calling for help when she was mortally wounded. The jury also knew of his 1980 conviction for unlawful imprisonment "by violence, menace, fraud, and deceit" of another female victim. Lord showed no remorse for his crimes, nor did he offer any explanation of extenuating circumstances.

In conclusion, given the totality of the circumstances presented to the jury, we are convinced that no improper evidence was admitted. As noted above, Lord himself chose to put forth evidence related to his prior crimes.

The challenged testimony was entirely reliable and presents none of the problems we examined in *Bartholomew*. We will not disturb the jury's unanimous decision that there were insufficient mitigating circumstances to merit leniency.

## Admission of Juvenile Conviction

Lord contends that he was denied due process and equal protection by the admission of his California juvenile conviction for second degree murder. To the extent that we can distill specific arguments from what is essentially a philosophical discussion, Lord appears to be making two arguments. First, allowing the sentencing jury to consider a juvenile conviction violates Const. art. 1, § 21[24] and the Sixth Amendment[25] because juveniles do not have the right to a jury trial. Second, the underlying conviction may be defective if the California court did not require that each of its elements be proved beyond a reasonable doubt.

Lord cites no authority for his first claim. Juveniles do not have a constitutional right to a jury trial under either article 1, section 21 or the Sixth Amendment. *State v. Schaaf*, 109 Wn.2d 1, 16, 743 P.2d 240 (1987); *State v. Lawley*, 91 Wn.2d 654, 658-59, 591 P.2d 772 (1979) (citing *McKeiver v. Pennsylvania*, 403 U.S. 528, 545, 29 L. Ed. 2d 647, 91 S. Ct. 1976 (1971)). Nor does due process require that juveniles have the right to a jury trial. *Lawley*, at 659.

As to his second argument, Lord contends that equal protection concerns arise if he was convicted under a lesser standard of proof than other defendants. However, the trial court specifically addressed this issue and, after reviewing the relevant documents and applicable law, concluded that the standard of proof utilized by the

---

[24]Article 1, section 21 provides, in part: "The right of trial by jury shall remain inviolate . . ."

[25]The Sixth Amendment provides, in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . ."

California court was guilt beyond a reasonable doubt. Lord does not challenge this conclusion. He cannot support an equal protection challenge on this basis.

The sentencing jury may consider "[w]hether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity", RCW 10.95.070(1), in determining if there are not sufficient mitigating circumstances to merit leniency.

Lord's constitutional claims are without merit. His juvenile conviction was properly admitted pursuant to RCW 10.95.070(1).

### Allocution

After the defense concluded its case, Lord chose to make an unsworn statement to the jury. He claims that he was denied due process by the trial court's decision to allow the prosecutor to cross-examine him following this statement. He contends that, because he was exercising his right to allocution, he was not subject to cross examination. The State does not dispute that Lord had a right to allocution. Rather, the State argues that cross examination was proper because Lord, in fact, gave testimony in the guise of allocution.

Allocution is a plea for mercy; it is not intended to advance or dispute facts. Historically, allocution was allowed:

> to show why judgment should not be pronounced against [a defendant] on verdict of conviction; or, whether he would like to make a statement on his behalf and present any information in mitigation of sentence . . .

Black's Law Dictionary 76 (6th ed. 1990). In contrast, testimony is offered to dispute a fact at issue or present evidence of another fact which the accused offers defensively. *State v. Mak*, 105 Wn.2d 692, 729, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991).

In *Mak*, we explained that allocution is not a vehicle which allows a defendant to testify as to his version of the facts while avoiding cross examination.

> [I]t appears that what the defendant was apparently seeking was the right, at the end of the penalty phase of the trial, *to present evidence on the issue before the jury* which would be uncross-examined, unsworn, unrebuttable and unanswerable by argument. Nothing in the statute contemplates or permits that, nor does our former allocution rule. The defendant was given his right to speak to the jury at the sentencing hearing without being required to take an oath, and was again given the right to speak to the trial court before sentence was actually imposed. There was no denial of the defendant's right to allocution.

(Footnotes omitted. Italics ours.) *Mak*, at 729.

The trial court here relied on *Mak* and ruled that, to the extent that Lord was engaged in allocution, he would not be subject to cross examination. However, if his statement presented evidence, the State could cross-examine. The court explained this ruling to the parties:

> The common sense limitation which says that he may ask for mercy based on a plea of some sort to the jury is also, I think, the common-law principal of the right of allocution. I don't think the common-law right of allocution or the historic right of allocution is predicated on the presentation of evidence, and once the defendant begins to present evidence in our historic sense, then I think he is subject to cross-examination. If he tells this jury, "I did not do it," then statements which may be admissible in rebuttal if they're admissible for other reasons, and will be the subject of cross-examination.
> . . .
> . . . He may not produce evidence in the sense we traditionally use evidence, that is he cannot deny the offense and not be confronted with potential evidence where he admits the offense and/or present factual issues on which he can be cross-examined. He may ask that jury for mercy. He may make statements about his own good person. And so I'm not denying him right to make a request for mercy, but he cannot testify and not be subject to cross-examination and rebuttal.

The court also made a special effort to ensure that Lord was aware of the parameters of his right of allocution. Lord was expressly warned that if he testified as to facts at issue, he would be subject to cross examination:

> MS. MANDEL: As a final matter, we have concluded our witnesses. . . . Mr. Lord has indicated his wish to allocute and we have advised him against doing that.
> THE COURT: Mr. Lord, are you going to speak to the jurors?

THE DEFENDANT: Yes.

THE COURT: You understand that I have previously ruled that certain kinds of statements may make you subject to cross-examination?

THE DEFENDANT: Yes.

THE COURT: And you understand that other kinds of statements may not make you subject to cross-examination?

THE DEFENDANT: Yes.

The court then stated:

> When Mr. Lord has finished speaking, I will probably take a recess and ascertain from the prosecutor whether they wish to cross-examine so I can make the decision about relevancy and/or get Mr. Lord seated in the witness stand for that to occur.

During his statement to the jury, Lord said that he had never asked anyone to lie for him. He denied making the statements to which the jail trusties testified. He said that law enforcement officers had "changed around" statements he made to them. He then stated:

> Then there was, since I didn't get to testify, my lawyers thought that was the wrong thing for me to do, which I wanted to but I was told not to, and I just would have liked to have been able to testify to be able to say my part of the story, you know. Because after I left the Fryes' house, September 16th, I went to my brother's, straight to my brother's, and from there I never left my brother's property, never.

He went on to relate his problems with drugs and alcohol and his prior criminal history, including facts about the unlawful imprisonment conviction. He concluded by stating that the County, the police and the prosecutor had lied during trial.

When Lord finished, the court excused the jury. After hearing argument from both sides, the court ruled that the prosecutor would be permitted to cross-examine Lord regarding his statement that he had not asked any witness to lie for him, his statement regarding leaving the Fryes', and his prior criminal record. Lord does not contend that the prosecutor exceeded the scope of this ruling. Rather, Lord argues that it was error to allow cross examination at all. We disagree.

██ Lord's discourse to the jury was not a plea for mercy. Instead, he used his unsworn statement as an opportunity to dispute evidence presented by the State and to offer his own version of the events the night of the crime. In other words, he offered testimony.

Had Lord limited his statement to the jury to allocution, it would not have been subject to cross examination. However, he did not. Lord was warned that certain types of statements would be subject to cross examination, and he indicated that he understood. Nonetheless, he proceeded to give evidence on a number of relevant and disputed issues. This opened the comments to cross examination, as the trial court correctly ruled.

## Denial of Competency Hearing

At the beginning of the penalty phase of Lord's trial, defense counsel moved for a hearing to determine if Lord was competent to proceed. The motion was based on statements Lord had made to jail staff, Lord's request that Mr. Ness withdraw as defense counsel, and Lord's insistence that defense counsel not call his family to testify on his behalf. The motion was not made at Lord's request. To the contrary, he told the court that he was competent and that a hearing was not necessary. The trial court ultimately denied the motion, based on its ruling that the threshold burden of establishing that such a hearing was required had not been met. On appeal, Lord argues that he was denied due process of law by the trial court's refusal to conduct a hearing.

██ A defendant is competent if he has the capacity to understand the nature of the proceedings against him and to assist in his own defense. *State v. Wicklund*, 96 Wn.2d 798, 800, 638 P.2d 1241 (1982); RCW 10.77.010(6). An incompetent person cannot be tried, convicted, or sentenced for the commission of an offense while his incapacity continues. *Wicklund*, at 800; RCW 10.77.050. A defendant need not be able to choose among alternative trial strategies to be competent. *State v. Ortiz*, 104 Wn.2d

479, 483, 706 P.2d 1069 (1985), *cert. denied*, 476 U.S. 1144 (1986). Thus, a disagreement between the defendant and counsel as to the manner in which to proceed, without more, does not raise the issue of competency.

▮ A competency hearing is required "[w]henever a defendant has pleaded not guilty by reason of insanity, or *there is reason to doubt his or her competency*". (Italics ours.) RCW 10.77.060(1). Thus, unless an insanity defense is raised, a hearing is required only if the court makes a threshold determination that there is reason to doubt the defendant's competency. If the court determines that there is reason to doubt the defendant's fitness, the court must hold a competency hearing in accordance with statutory procedures. *Seattle v. Gordon*, 39 Wn. App. 437, 441, 693 P.2d 741, *review denied*, 103 Wn.2d 1031 (1985).

These determinations are within the trial court's discretion.

> A motion to determine competency does not have to be granted merely because it has been filed, *United States v. McEachern*, 465 F.2d 833, 837 (5th Cir.), *cert. denied*, 409 U.S. 1043 (1972), and is not of itself sufficient to raise a doubt concerning competency.

*Gordon*, at 441. Thus, the motion must be supported by a factual basis. Only then will the court inquire to verify the facts. *Gordon*, at 441-42. In reviewing the motion, considerable weight should be given to the attorney's opinion regarding his client's competency and ability to assist the defense. *Gordon*, at 442.

In support of the present motion, defense counsel offered the testimony of Jamie Miller, the corrections officer who transported Lord from the jail to court. Miller said that earlier that day, Lord told him "he had a conversation with the Lord and the devil and the devil asked him to drink a cup of his own blood to prove his innocence". Also, Lord had asked Miller to handcuff him when he appeared in court because Lord was afraid of what he would do to attorney Ness. In response to questions by the prosecutor, Miller stated that Lord was ranting and raving

when he made the statement about the devil and, from his experience working in the jail, people in Lord's situation try to raise questions about their competency. Defense then stated that Lord did not want Ness to continue as his attorney. In response to questions from the court, Lord stated that, while he did not want Ness to continue as his attorney, he was not asking attorney Mandel to withdraw. Furthermore, he said he believed he was competent to assist either Ness or Mandel in his defense.

The court then denied Lord's request to remove Ness as counsel and ruled that a staff member from Western State Hospital would be allowed to interview Lord. The State did not object. The court also gave the defense an opportunity to have its own expert examine Lord. The prosecutor made arrangements for a psychiatrist and a psychologist to examine Lord the following morning, and the court authorized defense counsel to be present.

The following morning, Lord's attorney informed the court that, because they had not been able to make arrangements for their own expert to examine Lord, they would not allow the scheduled examination to proceed. The court then stated:

> So far the defendant has not established sufficient record by testimony, affidavit, medical report or their own statements to trigger a competency hearing. The appointment of the Western State experts yesterday was an attempt to be, in my opinion, extremely fair to Mr. Lord, to allow, at least before the Court even made a threshold decision about whether to hold a competency hearing, some medical evidence with which to proceed.

The court concluded that the defense's claim that Lord and his attorneys did not agree on how to proceed during the sentencing phase was not sufficient grounds for the court to find that competency was at issue. Specifically, the court noted that defense counsel had not made any assertion that Lord was unable to recall or relate facts sufficient for defense counsel to proceed in the sentencing phase.

The court next offered defense counsel an opportunity to supplement the record in support of the motion. Defense counsel stated that Lord was entitled to a hear-

ing based on his statements to the jailer, his anger at Ness, which his counsel characterized as irrational, and his requests that Ness withdraw as counsel and that his family not testify during the penalty phase. The court responded:

> I understand there was testimony yesterday from the jail staff. I listened to that testimony. I assume that testimony is accurate. I have observed Mr. Lord for 10 weeks. I observed Mr. Lord yesterday in court. I listened to him respond to the questions from the Court. I've watched him consult with his attorney, at this point there is not sufficient prima facie indicia for the Court to grant a full blown competency hearing.
>
> . . . What I'm asking counsel now is if they wish to supplement the record in any way at this point, and in their request to have a competency hearing. And I have not heard from counsel that the disagreement that they have with Mr. Lord goes to other than the strategy as to how to proceed in the sentencing phase.

Defense counsel then requested an in camera hearing to present further information in support of the motion. The court asked if they wanted the court to have an evaluation done by the experts from Western State as medical evidence to be considered in making the threshold determination of incompetency. Defense counsel again declined the offer of an evaluation and chose to proceed with an in camera hearing to supplement the information available to the court. The hearing was held, the proceedings of which were transcribed and filed under separate cover. After the hearing, the court ruled that defense counsel had failed to make the required threshold showing that a competency hearing was needed and, therefore, denied the motion.[26]

Upon a review of the record, including the transcript of the in camera hearing, we conclude that the trial court did not abuse its discretion in determining that defense counsel failed to meet its burden. The threshold burden of

---

[26]The court also ruled that Lord, "although competent to stand trial and to participate in the sentencing phase, is not competent to make trial strategy decisions . . . and it is not in his best interests for him to control the process by which his case will be presented to the jury in the sentencing phase." Thus, neither counsel was allowed to withdraw, and they were directed to proceed in a manner they believed to be in Lord's best interests.

establishing that there was reason to doubt Lord's competency was not met.

## Prosecutorial Misconduct

Lord claims that he was denied due process by misconduct during the State's closing argument. He contends that the prosecutor improperly argued that all murderers deserve the death penalty and improperly discussed the deterrent effect of the death penalty.

 Lord bears the burden of establishing both the impropriety of the prosecuting attorney's comments and their prejudicial effect. *State v. Mak*, 105 Wn.2d 692, 726, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991). Because the death penalty is unconstitutional when it is imposed mandatorily upon all murderers, *Woodson v. North Carolina*, 428 U.S. 280, 301, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976), Lord contends that it is improper to argue that all murderers deserve to die. Even assuming that is so, we are unconvinced that such an argument was made here.

Lord relies on the following portion of the prosecutor Irene Cleavenger's argument in support of this claim:

> Finally, just these thoughts. The life of each man should be sacred to each other man. The ancients tell us unflinchingly that they executed murderers. They realized it was not enough to proclaim the sacredness and the inviolability of human life. It must be secured as well by threatening those with the loss of their own lives. Those who violate what has been proclaimed as inviolable the rights of the innocent to live, allows the invaluability of human life that's neither credible by proclamation or actually protected.

Nothing in this language suggests that all murderers deserve the death penalty. This argument does little more than establish a philosophical and historical context for the jury's decision. The jury was aware that the death penalty is not mandatory for all murderers. Indeed, the very question the jury was to answer was if the death penalty was to be imposed in this case. Lord also contends that the prosecutor improperly discussed the deterrent effect of the death penalty in violation of *Hawkins v.*

*Rhay*, 78 Wn.2d 389, 400, 474 P.2d 557 (1970). In *Hawkins*, the court stated that the "evidence concerning the deterrent effect of one form of penalty as opposed to another shall not be received." *Hawkins*, at 400.

We again take issue with Lord's characterization of the prosecutor's argument. Lord relies on the following language:

> No society can profess that the lives of its members are secure if those who do not allow innocent others to continue living are themselves allowed to continue living at the expense of the community.
> Does this secure life to punish the murderer by incarcerating him as one does a pickpocket? Murder differs in quality from other crimes and deserves, therefore, a punishment that differs in quality from other punishments.

The prosecutor did not argue that the death penalty is a more effective deterrent than life in prison without possibility of parole. There was no error.

Having found no error during the penalty phase of Lord's trial, we now turn to the statutorily mandated review of his sentence.

### STATUTORY REVIEW

The sentencing jury unanimously found beyond a reasonable doubt that there were not sufficient mitigating circumstances to merit leniency. Under Washington's death penalty statute, this court reviews that decision by analyzing three separate issues:

> (a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95-.060(4); and
> (b) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. . . .; and
> (c) Whether the sentence of death was brought about through passion or prejudice.

RCW 10.95.130(2).

### Sufficiency

Under the sufficiency of the evidence analysis, this court must determine if:

" 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify this affirmative finding beyond a reasonable doubt.' " *State v. Rupe*, 108 Wn.2d 734, 765, 743 P.2d 210 (1987) (quoting *State v. Mak*, 105 Wn.2d 692, 761, 718 P.2d 407, *cert. denied*, 107 S. Ct. 599 (1986)).

*State v. Rice*, 110 Wn.2d 577, 623, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989). Our independent review of the record reveals the following possible mitigating circumstances: Lord has family and friends who love him and would visit him in prison; he was 26 at the time of sentencing; he is a good carpenter; his family did not help him deal with or try to understand the murder of Sylvia Henderson; he would do well in prison because of the structured environment; if sentenced to life without possibility of parole, he would never be released; he had head injuries; and he has an antisocial personality disorder.

Viewed in the context of the totality of the evidence, these mitigating circumstances are relatively unpersuasive. "[T]he mere presence of mitigating factors does not require a jury to grant leniency, so long as it is convinced beyond a reasonable doubt that any mitigating factors are outweighed by the circumstances of the crime." *Rice*, at 624. Here, there was sufficient evidence to warrant the jury's decision.

The psychologist called by the defense testified that while Lord's head injuries "could exacerbate his difficulties controlling impulses", the injuries "do not entirely, in and of themselves, explain a loss of impulse control." More importantly, there was no evidence that Lord suffered from a head injury before he murdered Sylvia Henderson. The psychologist also testified that Lord has an antisocial personality disorder. However, he stated that the disorder helps to explain, but does not excuse, Lord's behavior. Furthermore, one of the diagnostic criteria for the disorder is a history of violating the rights of others. Thus, the evidence that Lord suffered from an antisocial personality disorder may very well have been discounted by the jury as a mitigating factor.

In the current case, Lord was convicted of aggravated premeditated murder in the first degree of a 16-year-old girl. Tracy Parker was raped, bludgeoned to death with a hammer, and her body was dumped by the side of a road. Lord had two prior convictions: one for second degree murder and the other for unlawful imprisonment through violence, menace, fraud and deceit. He has been convicted three times for violent offenses against women he knew. While he acknowledged doing "terrible" things in his life, he showed no remorse for any of his crimes. There was sufficient evidence for a rational trier of fact to find that leniency was not merited.

We note that Lord does not argue that there is not sufficient evidence to support the jury's affirmative finding. Rather, he argues that the death penalty should not be imposed because there is not sufficient evidence to support his *conviction*. This allegation has already been addressed in our discussion of the guilt phase and is simply misplaced under this portion of our review. Moreover, Lord fails to argue which, if any, of the mitigating circumstances presented during the sentencing phase support the conclusion that no rational trier of fact could have found sufficient evidence to support the jury's affirmative answer.

## Proportionality

RCW 10.95.130(2)(b) requires this court to determine:

> Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120[.]

The statute provides a starting point by defining "similar cases". Under RCW 10.95.120, reports must be filed "[i]n all cases in which a person is convicted of aggravated first degree murder". The similar cases pool includes those cases in which the death penalty was sought and those in which it was not.

Defining the concept of "excessive or disproportionate" is more difficult. There is no clear test or guidance given in the language of the statute. We begin with a brief historical review of the impetus for, and the purpose of, proportionality review.

The process was undertaken in Washington in response to the United States Supreme Court decision in *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972); *State v. Harris*, 106 Wn.2d 784, 725 P.2d 975 (1986), *cert. denied*, 480 U.S. 940 (1987). *Furman* prohibits sentencing procedures which create a substantial risk that death will be imposed in an arbitrary and capricious manner. *Gregg v. Georgia*, 428 U.S. 153, 188, 49 L. Ed. 2d 859, 96 S. Ct. 2909, *reh'g denied*, 429 U.S. 875 (1976). In other words, where the death penalty is imposed wantonly and freakishly, it is unconstitutional. *Furman*, at 310 (Stewart, J., concurring).

In *Gregg*, the Court upheld the constitutionality of the death penalty statute enacted by Georgia in the wake of *Furman*. *Gregg*, at 207. The Court specifically addressed the statutorily mandated proportionality review and concluded that it serves to prevent caprice in the decision to inflict the penalty by "substantially eliminat[ing] the possibility that a person will be sentenced to die by the action of an aberrant jury." *Gregg*, at 206. Thus, proportionality review, while not constitutionally required, provides a safeguard against arbitrarily imposed death sentences. *Lewis v. Jeffers*, ___ U.S. ___, 111 L. Ed. 2d 606, 622, 110 S. Ct. 3092 (1990); *Pulley v. Harris*, 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984); *State v. Rupe*, 108 Wn.2d 734, 766-67, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988).

In our earlier cases, proportionality review was somewhat truncated, in part because there was a limited pool of cases for comparison.[27] In each case, the court con-

---

[27] Initially, this court apparently looked only to those cases where the death penalty had been sought. However, in *State v. Rupe, supra* at 767, it was made clear that the proper pool of cases to be reviewed includes all cases where the defendant was convicted of first degree aggravated murder whether or not the death penalty was sought. RCW 10.95.120.

cluded that the sentence was not excessive. *See State v. Campbell*, 103 Wn.2d 1, 30, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985); *State v. Jeffries*, 105 Wn.2d 398, 430, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986); *State v. Mak*, 105 Wn.2d 692, 722, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991).

▮ Then, in *State v. Harris, supra* at 798, this court acknowledged that the statute "provides little guidance to determine at what point a death sentence becomes proportionate or disproportionate." Because Georgia's proportionality statute is similar to our statute, we looked to Georgia's interpretation of its statute for guidance. We then adopted the current test:

> [T]his court is not required to determine that less than a death sentence was never imposed in a case with some similar characteristics. On the contrary, we view it to be our duty under the similarity standard to assure that no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed *generally* and not "wantonly and freakishly imposed," . . .

*Harris*, at 798 (quoting *Moore v. State*, 233 Ga. 861, 864, 213 S.E.2d 829 (1975)). Relying again on the aggravating factors found as a basis for comparison, this court upheld the sentence in *Harris* after determining that it was not "wantonly and freakishly" imposed. *Harris*, at 799.

Since *Harris*, this court has engaged three times in proportionality review of death sentences. *State v. Rupe, supra* at 766-67; *State v. Rice*, 110 Wn.2d 577, 625, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989); *In re Jeffries*, 114 Wn.2d 485, 489-90, 789 P.2d 731 (1990). Although in each case we restated the language from *Harris* (*Rupe*, at 767; *Rice*, at 625; *In re Jeffries*, at 490), the method of applying that test remains to be clarified.

▮ It is helpful to keep in mind the purpose of proportionality review and the limits inherent in such review. As the Supreme Court has repeatedly acknowledged, there can be " 'no perfect procedure for deciding in which cases governmental authority should be used to impose

death.' " *Zant v. Stephens*, 462 U.S. 862, 884, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983) (quoting *Lockett v. Ohio*, 438 U.S. 586, 605, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978)), *cited in State v. Mak, supra* at 724 and *State v. Rupe, supra* at 766-67. Our concern is with alleviating the types of major systemic problems identified in *Furman*: random arbitrariness and imposition of the death sentence based on race. *Gregg*, at 188; *Furman*, at 257 (Douglas, J., concurring). Technical inconsistencies in a line-by-line comparison cannot be equated with those core concerns. *Pulley v. Harris*, 465 U.S. at 54; *State v. Mak, supra* at 724; *see also State v. Rupe, supra* at 766-67.

Our review is not intended to ensure that there can be no variation on a case-by-case basis, nor to guarantee that the death penalty is always imposed in superficially similar circumstances. As we explained in a prior case:

> Simply comparing numbers of victims or other aggravating factors may superficially make two cases appear similar, where in fact there are mitigating circumstances in one case to explain either a jury's verdict not to impose the death penalty or a prosecutor's decision not to seek it.

*In re Jeffries, supra* at 490. Requiring precise uniformity would not only be unworkable, it would effectively eliminate the death penalty. Indeed, the jury is directed to tailor its decision to the individual circumstances of the crime. A jury could decline to impose the death penalty because a particular defendant deserves mercy. However, the decision to afford one defendant mercy, and yet not another, does not violate the constitution. *Gregg*, at 199; *State v. Mak, supra* at 724.

Lord would have us review his case as a forensic scientist analyzes fingerprints, looking for a specified number of identity points. Only if one can conclusively determine that each swirl, ridge, and whorl is present in both samples is a match declared. We decline to do this. Crimes, particularly the brutal and extreme ones with which we deal in death penalty cases, are unique and cannot be matched up like so many points on a graph.

■ Our approach, perhaps, can instead best be explained as a search for "family resemblances". *See* L. Wittgenstein, *Philosophical Investigations* §§ 65-67 (1958). Although the cases where death was imposed do not necessarily have one characteristic or set of attributes in common, we nonetheless recognize that they are somehow related. This relation cannot easily be described; it consists of a complicated network of overlapping similarities — much like members of the same family, who can be recognized as relatives, even though they do not all share any one set of features. Thus, we examine prior cases for those which belong together because they resemble each other.

With the foregoing in mind, we have reviewed both the reported cases and the filed reports as required by RCW 10.95.130(2)(b). We turn now to the application.

We first consider the crime of which Lord was convicted. Lord murdered a single victim, 16-year-old Tracy Parker. Two other defendants who are currently under sentence of death were convicted of only one aggravated first degree murder. Report of the Trial Judge, State v. Furman, Kitsap Cy. cause 89-1-00304-8 (Mar. 9, 1990); Report of the Trial Judge, State v. Harris, Pierce Cy. cause 84-1-01190-6 (Jan. 18, 1985). Moreover, unlike Furman and Harris, Lord had previously been convicted of murder.[28] Similarly, in other single victim rape-murder cases where death was not sought, the defendant had not previously committed murder. *E.g.*, Report of the Trial Judge, State v. Thomas, King Cy. cause 86-1-04723-5 (Feb. 22, 1991).

The jury found Lord guilty of premeditated first degree murder with the following aggravating circumstances: The murder was committed to conceal the commission of

---

[28]While Harris had killed before, he was only convicted of manslaughter, which requires a reckless or negligent mental state rather than the intentional mental state supporting Lord's second degree murder conviction. Report of the Trial Judge, State v. Harris.

a crime; to conceal Lord's identity; and in the course of, or in immediate flight from, the crimes of rape or kidnapping. RCW 10.95.020(7), (9); Verdict Form A; Special Verdict Form A-1. Only one aggravating factor is needed for the prosecutor to seek, or a jury to impose, the death penalty, provided there are not sufficient mitigating circumstances to warrant leniency. RCW 10.95.020, .030. Lord's sentence is proportionate to sentences given in other cases given the aggravating factors that were found. Report of the Trial Judge, State v. Jeffries, Clallam Cy. cause 6488 (Nov. 29, 1983) (conceal identity and multiple victims); Report of the Trial Judge, State v. Rupe, Thurston Cy. cause 81-1-00316-1 (July 12, 1982) (conceal. identity, multiple victims, and in the course of robbery); Report of the Trial Judge, State v. Benn, Pierce Cy. cause 88-1-01280-8 (July 23, 1990) (multiple victims).

Finally, Lord bludgeoned Tracy to death with a hammer, inflicting multiple blows to her head, teeth and genitals. Because the medical examiner was unable to determine the sequence of the blows, there is no way to tell how much Tracy suffered before dying. Lord's method of murder was more vicious and took longer than that employed by other defendants sentenced to death. Report of the Trial Judge, State v. Rupe (single gunshot wound to head); Report of the Trial Judge, State v. Harris (quick murder); Report of the Trial Judge, State v. Hazen, Clark Cy. cause 85-1-00322-5 (Apr. 21, 1986) (no struggle preceded gunshots); Report of the Trial Judge, State v. Jeffries (no evidence of any torture; gunshot wounds). It was also more brutal than the murders in several cases where death was not imposed. Report of the Trial Judge, State v. Knight, King Cy. cause 86-1-01678-0 (Feb. 4, 1991); Report of the Trial Judge, State v. Thomas, King Cy. cause 86-1-04723-5 (Feb. 22, 1991).

Next we consider Lord's personal characteristics. Lord has established a pattern of violent behavior. He has two

prior convictions for violent crimes against women he knew. At age 14, he murdered a family friend by shooting her with two different guns while she was on the telephone calling for help. When he was 19, he was convicted of the unlawful imprisonment of his sister-in-law, who was hospitalized as a result of injuries inflicted by Lord. Additionally, Lord volunteered information during his unsworn statement to the jury that he had served time in jail for driving his car head on into a truck while driving drunk, badly injuring a friend of his. After the accident, he continued to drink and smoke marijuana.

Lord has also established a pattern of noncompliance with probation conditions and prison regulations. Lord violated the conditions of his probation from his second degree murder conviction. He also told the jury that he had asked his wife to smuggle marijuana in to him while he was in prison for the unlawful imprisonment conviction.

Nor is Lord's sentence disproportionate on the basis of his criminal record. One defendant currently on death row had no prior convictions. *Rupe*, 108 Wn.2d at 770. Lord's willingness to take another life, Tracy's, after having been convicted of murder at an early age, indicates that he continues to pose a threat to others. Moreover, Lord did not present evidence of sufficiently compelling mitigating circumstances, such as those noted in cases where death was not sought. Report of the Trial Judge, State v. Ortiz, Whatcom Cy. cause 81-1-00201-6 (Dec. 9, 1981) (defendant retarded); Report of the Trial Judge, State v. Cummings, Walla Walla Cy. cause 85-1-00044-4 (Dec. 20, 1989) (defendant 16 years old).

Lord was 26 years old at the time he raped and murdered Tracy Parker. However, his relatively young age does not render his sentence disproportionate. Younger defendants have been sentenced to death. Report of the Trial Judge, State v. Furman (17 years, 10 months); Report of the Trial Judge, State v. Hazen (19 years).

Given the nature of Lord's crime, the number of aggravating factors, his prior convictions and personal history, we cannot conclude that his death sentence was excessive or disproportionate. In comparing his crime and personal history with similar cases, we find that Lord's case sufficiently resembles those in which a sentence of death was imposed. Thus, we hold that the required proportionality is present here.

Lord also contends that the reports on file with this court do not provide enough information for this court to perform a meaningful review. However, as the State notes, the reports on file are in compliance with RCW 10.95.120 and are, therefore, sufficient under the statute.

In a related, and novel, argument, Lord contends that the trial judge should have allowed the jury to learn of "the sentences that other defendant's who had committed a murder during the course of a rape typically received." Brief of Appellant, at 110. The sole authority cited for this argument is ER 401, which defines relevance.

The death penalty statute, which provides an illustrative list of eight factors the jury may consider in deciding if sufficient mitigating circumstances exist to merit leniency, allows the jury to consider those circumstances that arise in connection with the specific crime and defendant. RCW 10.95.070. Decisions of this court, *State v. Jeffries*, 105 Wn.2d 398, 422, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986), and of the United States Supreme Court, *Eddings v. Oklahoma*, 455 U.S. 104, 110, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978); *Woodson v. North Carolina*, *supra* at 304, are in accord. The trial court correctly rejected this evidence as irrelevant.

### Passion or Prejudice

Our review of the record discloses no competent evidence that the imposition of the death penalty came about through passion or prejudice, RCW 10.95.130(2)(c), nor does Lord offer such evidence. Rather, in support of his claim, he merely reiterates alleged trial errors already addressed in other parts of this opinion. We conclude that Lord's sentence was not the result of passion or prejudice.

### Constitutional Challenges to the Death Penalty

Finally, Lord challenges the constitutionality of Washington's death penalty statute, RCW 10.95, on a number of grounds. He raises the following 14 issues: (1) Does the statute violate the separation of powers doctrine? (2) Does the statute violate the equal protection clauses of the federal and state constitutions? (3) Is it unconstitutionally void for vagueness? (4) Does it constitute an unlawful delegation of legislative authority to the executive branch of government? (5) Does the imposition of the death penalty constitute cruel and unusual punishment? (6) Should Lord have been charged by grand jury indictment instead of by information? (7) Does the combined effect of the statute and not obtaining a grand jury indictment exacerbate the violation of separation of powers doctrine? (8) Does the statute amount to a mandatory death penalty in violation of the Eighth Amendment and article 1, section 14 of the state constitution? (9) Does it unconstitutionally shift the burden of proof on the death penalty issue to the defendant? (10) Is defendant's right to appellate review denied because the statute does not require the jury to articulate which mitigating circumstances were found and how they were weighed? (11) Does RCW 10.95.130(2)(b) constitute a legislative encroachment upon an exclusively judicial function, violating

the separation of powers doctrine? (12) Does RCW 10.95-.120 deny a defendant the right to a fair trial, due process of law, effective assistance of counsel, and confrontation by failing to provide defendant a right to rebut information given to the trial judge? (13) Does the statute promote unequal administration of law in violation of the Fourteenth Amendment? (14) Is RCW 10.95.020 unconstitutional because it does not genuinely narrow the class of persons eligible for the death penalty? Each of these questions was answered in the negative in the following cases: *State v. Campbell*, 103 Wn.2d 1, 691 P.2d 929 (1984) (issues 1-5), *cert. denied*, 471 U.S. 1094 (1985); *State v. Ng*, 104 Wn.2d 763, 713 P.2d 63 (1985) (issue 6); *State v. Jeffries*, 105 Wn.2d 398, 717 P.2d 722 (issues 7-12), *cert. denied*, 479 U.S. 922 (1986); *State v. Dictado*, 102 Wn.2d 277, 687 P.2d 172 (1984) (issue 13); *State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984) (*Bartholomew* II) (issue 14).

Lord raises a number of other issues through both appellate counsel and his pro se brief. We have reviewed each of these issues and conclude that none of them merit individual attention.

In conclusion, this tragic case was surely one of the most complex ever tried in this state. The overwhelming amount of technical evidence, scores of witnesses, and seriousness of the charge combined to create a legal maelstrom. Nonetheless, the trial judge carefully protected Brian Keith Lord's right to a fair trial and ensured that the punishment imposed, while harsh, was just. We commend her.

The judgment and sentence in this case are affirmed.

BRACHTENBACH, DOLLIVER, ANDERSEN, and GUY, JJ., and CALLOW, J. Pro Tem., concur.

APPENDIX

| | BLOOD ADA 2-1 "O" | BLOOD "O" | HUMAN BLOOD "O" | BLOOD "O" | CONSISTENT W/ BLOOD | PAPER W/ BLOOD "?" | COARSE BODY HAIR (DISCOLORED) "?" | COARSE BODY HAIR | "BEAN" MATCHBOOK | CHARCOAL | METAL FRAGMENTS | PLASTER | WHITE PAINT | BLUE PAINT | GREEN PAINT #1 | GREEN PAINT #5 | GREEN PAINT #6 | GREEN PAINT #7 | RED PAINT #1 | RED PAINT #2 | RED PAINT #3 | YELLOW PAINT | ORANGE FIBERS | PALE BROWN CARPET | BLUE FIBERS (POLO SHIRT) | BLUE BLANKET FIBERS | RED BLANKET FIBERS | RED COTTON FIBERS | DOG HAIR "SANDY" (FRYE'1 DOG) | DOG HAIR "TARGY" (FRYE'2 DOG) | WOOD CHIPS | ROYAL BLUE COTTON FIBERS | FOOTNOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ISLAND LAKE 9/21/86 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| JACKET | • | • | | | | | | | ■ | ■ | ■ | ○ | | • 6 | | | • • | | | • | • • • | • | | | | | • • • | S | | | C | |
| RED SWEATSHIRT | • | • | | | | | | | • | • | • | ○ | | | | | | | | | • • • | • | | • | | | • • | | | | | |
| JEANS | | • | | | | | | | • | • | • | ○ | | | | | | | | | | | | • | | | | | | | | |
| SHOES | | | • | | | | • | | | | | | | | | | | | | | • | | | | | | | | | | | |
| PANTIES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TOWEL | | | | | | | | | | • | ■ | ○ | | | | | | • | • | | • | • | | | | | • • | | | | | |
| "BEAN" MATCHBOOK | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ORANGE U-HAUL BLANKET 9/21/86 DISCOVERED | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 9/22/86 RECOVERED | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TRACE EVIDENCE | • | | | | | | | | • | • | • | • | • | ? | | • | • • | | • | • | • | • | | • | • | | • | S | | | C | |
| KIRK LORD SHOP 9/19/86 - | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DOOR | | • • | | • • | • | | | | | ■ | ■ | | • | ? | | | | | | • | | | | | | | | | | | | |
| FLOOR | • | • | | | | | | | | • | • | | | | | | • | • | | • | • | | | • | | | | | | | | |
| BROOM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BLUE U-HAUL BLANKET HANDLE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TRACY PARKER'S BODY 9/19/86 DISCOVERED | | | | | • | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 10/1/86 RECOVERED | | | | | | | | • | • | | | | | | | | | | | | • | • | X | | • | S | | | | | | |
| BLUE SWEATSHIRT | | | | | | | • | | | | | | | | | | | | | | | | | | | | | | | | | |
| ROYAL BLUE POLO SHIRT | | | | | | | | | • | ■ | ■ | ○ | • | 1 | | | • | | • | • | • | • | X | | • | S | | | | | | |
| BLUE T-SHIRT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BRA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HAIR | | • | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BLOOD SAMPLE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BODY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BLUE CHEVROLET PICKUP TRUCK 10/1/86 | • | | | | | | | | ■ | • | ■ | ○ | • | 5 | | | • | | | | • | • | X | | • | S | | | | | | |
| TRACE EVIDENCE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ROPE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| "BEAN" MATCHBOOK | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FENCE SAMPLES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 5 6 7 | |

Dore, C.J. (concurring in the result of the dissent) — In previous review of capital punishment cases before this court, to wit:

*State v. Campbell*, 103 Wn.2d 1, 691 P.2d 929 (1984)
*State v. Harris*, 106 Wn.2d 784, 725 P.2d 975 (1986)
*State v. Jeffries*, 105 Wn.2d 398, 717 P.2d 722 (1986)
*State v. Mak*, 105 Wn.2d 692, 718 P.2d 407 (1986)
*State v. Rice*, 110 Wn.2d 577, 757 P.2d 889 (1988)
*State v. Rupe*, 108 Wn.2d 734, 743 P.2d 210 (1987)
*State v. Rupe*, 101 Wn.2d 664, 683 P.2d 571 (1984)

I affirmed the jury verdicts of death. For the first time in the 10 years I have been on the Supreme Court I now dissent on a capital punishment case.

I dissent because I feel the defendant did not have a fair trial. I concur in Justice Utter's dissent based on the following particulars:

I agree with the dissent that the trial court committed reversible error in allowing the summary chart to go into the jury room with the jury. I also agree that the court erred when, during the sentencing phase, it admitted information elicited from Lord's father concerning Lord's convictions for second degree murder and unlawful imprisonment and his probation violations and flight from police. The prejudicial effect of this evidence greatly outweighed its rebuttal value. *State v. Bartholomew*, 101 Wn.2d 631, 643, 683 P.2d 1079 (1984).

This case should be reversed and remanded for a new trial.

Utter, J. (dissenting) — I dissent for four reasons. First, the challenged summary chart[29] is inaccurate and argumentative. As a result, the trial court erred both in admitting the chart and in sending it to the jury room.

---

[29]My use of the phrase "summary chart" refers to exhibit 143. Exhibit 143 is an 8- by 4-foot chart that purports to summarize the testimony of several experts. Although I believe there are problems with both exhibits 141 and 143, I will directly address only those problems related to 143.

Second, the evidence the State elicited during the cross examination of Lord's father was prejudicial and did not rebut any mitigating evidence. Therefore, admission of that evidence violates the rule set out in *State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984) (*Bartholomew* II).[30] Third, the trial court erred in allowing the State to cross-examine Lord's allocution statement. Fourth, Lord's sentence is disproportionate to that generally given in similar cases.

The error in admission of the summary chart is constitutional error since it violates Lord's right to due process. Therefore the error requires reversal unless the State proves beyond a reasonable doubt that the error was harmless. *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). The State has not met its burden, and we should reverse the finding of guilt. Even if that were not the case, the errors in the sentencing phase require the vacation of the sentence. Therefore, I dissent.

# I
## SUMMARY CHART

As the majority correctly points out, the danger in a summary chart is that the jury "might rely upon the alleged facts in the summary as if these facts had already been proved or as a substitute for assessing the credibility of witnesses." Majority opinion, at 856. That is exactly the problem in this case.

The State's theory is that Lord killed Parker in his brother's workshop, wrapped her body in an orange U-Haul blanket, and used his brother's truck to dispose of the body. To support that theory, the State presented hundreds of pieces of trace evidence that purportedly link Parker to the blanket, the workshop, and the truck. The chart supposedly summarizes the experts' testimony surrounding that evidence.

---

[30] *State v. Bartholomew*, 98 Wn.2d 173, 654 P.2d 1170 (1982) (*Bartholomew* I), *State's cert. granted and remanded*, 463 U.S. 1203, *defendant's cert. denied*, 463 U.S. 1212 (1983) was vacated by the United States Supreme Court and the case remanded for reconsideration.

In fact, the chart does not accurately summarize that testimony. Instead, the chart summarizes *the State's interpretation* of the experts' testimony. All of the experts' testimony was necessarily speculative and inconclusive. Yet the chart takes that speculative, inconclusive testimony and converts it into definitive, conclusory statements. In so doing, the chart unfairly argues only the State's theory of the case.

For example, there is a category on the chart labeled "T. Parker Head Hairs". The key piece of evidence allegedly linking all of the trace evidence to Lord and Parker is the orange U-Haul blanket. The crime lab found a human hair on the blanket. Cindy Jay testified it is impossible to determine for certain who is the source of a particular hair sample.[31] The best she could conclude was that "Tracy Parker cannot be eliminated as the source" of the hair found on the blanket.[32] The chart, however, shows positively that one of Parker's head hairs was found on the blanket. In looking at the chart one reaches the inevitable conclusion that Parker had contact with that blanket. Thus the chart takes the speculative testimony that the hair might be Parker's, draws the inference most favorable to the State, and improperly concludes for the jury that the hair *is* Parker's.

Similarly, there is a category on the chart labeled "Coarse Body Hair (Defendant)". The testimony, however, established only that the hair "could have" come from the defendant.[33] The chart again unfairly draws the conclusion for the jury that the hair *is* that of the defendant.

The majority concludes any possible prejudice from the coarse body hair category "was eliminated by Lord's concession during closing argument that he had contact with the orange blanket." Majority opinion, at 860. Lord,

---

[31]Report of Proceedings vol. XXIII, at 3815.

[32]Report of Proceedings vol. XXIII, at 3905.

[33]Report of Proceedings vol. XXIII, at 3920; vol. XXX, at 4914.

however, conceded nothing. He did not testify in the guilt phase of the trial. His attorney, in closing, did concede Lord had contact with the blanket. That "concession", however, is not dispositive of the issue of whether the hair did in fact come from Lord. Furthermore, that statement is not substantive evidence that the jury may consider.

The majority travels over shaky ground when it concludes an attorney in a criminal case may "concede" a fact for the attorney's nontestifying client. Such a conclusion raises serious questions about ineffective assistance of counsel and about the defendant's right to remain silent. It also ignores the precept that an attorney's argument is not evidence. In support of this dangerous proposition, the majority cites only *United States v. Abbas*, 504 F.2d 123 (9th Cir. 1974), *cert. denied*, 421 U.S. 988 (1975). There is no language in *Abbas*, however, referring to any concessions of either the defendant or his attorney. *Abbas* simply does not support the majority's conclusion on this issue.

A few other examples of the chart's inaccuracies will suffice to show how it unfairly mischaracterizes the testimony. No expert examined the wood chips or testified that they had a common source.[34] Yet the chart links all of the chips together and leads to the inescapable conclusion that the chips are from a common source. Similarly, there was testimony that the orange fibers "could have" a common source.[35] Yet the chart conclusively links all of the fibers together. The same is true of all of the paint samples and metal fragments listed. The testimony was always that they "could have" a common source, or that they were "similar". Yet the chart conclusively links all of them together, and one viewing the chart cannot help but conclude all of the trace evidence *did in fact* come from a common source.

---

[34]Report of Proceedings vol. XXXVIII, at 6072.

[35]Report of Proceedings vol. XXXVI, at 5922-25.

The prosecutor argued this very point to the jury. In her closing the prosecutor referred to the chart and said:

the [trace evidence] items within here match with the orange blanket, match with items from the shop, match with items on Tracy Parker's body, match with the truck . . ..

Report of Proceedings vol. XLVI, at 7312. While it is proper for the prosecutor to draw such inferences from the testimony, it is improper for the chart to show the evidence in such a conclusory form. *Lloyd v. United States*, 226 F.2d 9, 17 (5th Cir. 1955).

The prejudice that results from such evidence is clear. The State used the testimony concerning all of the different samples of trace evidence to link Lord to the blanket, and the blanket to the victim. That is certainly a proper inference for the prosecutor to draw from the evidence. The chart, however, moves out of the realm of inference and into the realm of fact. The chart inescapably leads an observer to conclude that all of the trace evidence did in fact come from the same source, and that therefore (for example) the red paint found on Tracy Parker's hair is the same as the red paint found on the blanket and on the broom in Kirk Lord's workshop. Thus testimony that the three red paint chips were "similar" is transformed into a statement that the chips were the same. When taken together, the transformation of the speculative, inconclusive testimony about all of the hundreds of pieces of trace evidence into a conclusive display of fact unduly prejudiced Lord. The chart misleads the jury by unfairly emphasizing the State's case, and it creates the impression that the underlying facts upon which the chart is based have been conclusively established. Therefore, the trial court erred in admitting the chart. *Accord*, 5 J. Weinstein & M. Berger, *Evidence* § 1006[07], at 1006-15 (1983).

The trial court then compounded the error by sending the chart to the jury room. Inaccurate summary charts should not be sent to the jury room. *United States v. Cox*, 633 F.2d 871, 874 (9th Cir. 1980), *cert. denied*, 454 U.S.

844 (1981).[36] Such evidence "present[s] an unfair picture of the testimony at trial and can be a potent weapon for harm due to its great persuasiveness." *Cox*, 633 F.2d at 874. Admitting inaccurate, misleading charts inevitably prejudices the defendant and requires reversal. *United States v. Altruda*, 224 F.2d 935, 942 (2d Cir. 1955).

According to the majority, any prejudice caused by the errors in the chart were cured by the fact the jurors heard the equivocal and uncertain nature of the experts' testimony. The majority believes that because the jurors heard all of the testimony, then they could not have been misled by the chart's inaccuracies. In fact, the opposite is true.

As the majority points out, the State's experts testified for all or part of 18 days. Much of the testimony was repetitive and monotonous. The experts referred to many of the exhibits by two and sometimes three different identification numbers.[37] Buried within all of that testimony were the equivocal statements that various pieces of trace evidence "could have" come from a common source.[38] Thus the jurors could easily have been confused as to what exactly was being testified to. Once the jurors were in

---

[36]*Accord, United States v. Abbas, supra; United States v. Espinosa*, 771 F.2d 1382 (10th Cir. 1985); *Pierce v. Ramsey Winch Co.*, 753 F.2d 416 (5th Cir. 1985); *United States v. Scales*, 594 F.2d 558 (6th Cir.), *cert. denied*, 441 U.S. 946 (1979); *United States v. Conlin*, 551 F.2d 534 (2d Cir.), *cert. denied*, 434 U.S. 831 (1977).

[37]The following exchange illustrates this problem.
"Q: To begin with [paint] type No. 1, which did you assign into that classification? Any of these that we've just talked about?"
"A: Type No. 1 I assigned from EO 1. Those are the sweepings from the workshop, AK 3, that's the fence post, and also N 06, which is the debris from Tracy Parker's leg."
"Q: When did you microscopically look at paint samples from AK 3, which is State's Proposed Exhibit 131B, as in baker?" Report of Proceedings vol. XXXVI, at 5847.

[38]*See, e.g.*, Report of Proceedings vol. XXXV, at 5757 (paint chips were "similar"); 5760 (white paint chips "could have" a common source); vol. XXXVI, at 5841 (green paint chips are "similar"); 5858 (same); 5909 (yellow paint chips "could have come from the same source"); 5925 (orange fibers "could have come from the blanket"); vol. XXXVII, at 5944 (pale grayish brown fibers "could share a common origin").

their deliberations, it would have been easy and perhaps natural for them to rely heavily on the chart and its inaccuracies.

Thus the jury may have relied "upon the alleged facts in the summary as if these facts had already been proved or as a substitute for assessing the credibility of witnesses." *Scales*, 594 F.2d at 564. Furthermore, sending the chart to the jury room allowed the chart to become a continuing voice for the State's interpretation of the evidence. The fact that the jury may have relied on the inaccurate chart is enough to establish prejudice.

Reversal is required unless the State proves beyond a reasonable doubt that the error was harmless. The error was harmless only if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). The State has not met its burden of proving the error harmless.

The majority concludes that the prejudice caused by sending the chart to the jury room was eliminated by the court's limiting instruction, and by the defense cross examination of the experts. However, limiting instructions cannot cure the error where, as here, the chart is too conclusory and emphasizes too much of the State's case. *United States v. Scales*, 594 F.2d 558, 564 (6th Cir.), *cert. denied*, 441 U.S. 946 (1979).

The majority relies primarily on *United States v. Abbas*, 504 F.2d 123 (9th Cir. 1974), *cert. denied*, 421 U.S. 988 (1975), to support the argument that a limiting instruction and an opportunity to cross-examine cures error. *Abbas* is distinguishable because there the court found the challenged charts contained no errors related to the counts for which the jury convicted the defendant. 504 F.2d at 126. In contrast, exhibit 143 here contained numerous errors by inaccurately summarizing the experts' inconclusive testimony as conclusively proven facts. The majority also cites *United States v. Krasn*, 614 F.2d 1229 (9th Cir. 1980). There is nothing in *Krasn*,

however, that indicates there were in fact errors in the challenged chart.

The most critical distinction between the cases the majority cites and this case is that none of the cases the majority relies on are capital cases. As the majority correctly observes, we are required to apply heightened scrutiny in capital cases.[39] Thus the reasoning in noncapital cases is not dispositive.

The purpose of heightened scrutiny is to assure the existence of the greater degree of reliability that is required before the death penalty may be imposed. *Murray v. Giarratano*, 492 U.S. 1, 8-9, 106 L. Ed. 2d 1, 109 S.

---

[39]The majority insists that this court should only apply greater scrutiny to the sentencing phase of a capital trial. As the Supreme Court recently stated in *Murray v. Giarratano*, 492 U.S. 1, 8, 106 L. Ed. 2d 1, 109 S. Ct. 2765, 2770 (1989): "We have recognized on more than one occasion that the Constitution places special constraints on the procedures used to convict an accused of a capital offense and sentence him to death." In particular, the Court in *Beck v. Alabama*, 447 U.S. 625, 65 L. Ed. 2d 392, 100 S. Ct. 2382 (1980) recognized the importance of heightened judicial scrutiny of both the guilt and sentencing phases of a capital case. The Court in *Beck* invalidated an Alabama rule that prohibited an instruction on a lesser included offense in the guilt phase of a capital trial. After noting that there is a significant constitutional difference between the death penalty and lesser punishments, the Court wrote:

> To insure that the death penalty is indeed imposed on the basis of "reason rather than caprice or emotion," we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination.

(Footnote omitted.) 447 U.S. at 638. Such heightened scrutiny is appropriate during the guilt phase of a capital case, because procedural irregularities during the guilt phase can unfairly expose a defendant to the death penalty. Recently, the Kentucky Supreme Court recognized the higher standard of review at both the guilt and penalty phases of cases where the death penalty was imposed. *Cosby v. Commonwealth*, 776 S.W.2d 367, 369 (Ky. 1989).

Moreover, this court itself has recognized that the guilt phase of capital cases is qualitatively different from the guilt phase of noncapital cases. For example, in *State v. Jeffries*, 105 Wn.2d 398, 418, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986), this court took a liberal approach to construing procedural rules in the guilt phase of a capital case. In *Jeffries*, this court allowed the defendant to challenge jury instructions even though no objection to them was made at trial. The usual rule is that this court does not review an issue where the proper objection is not made at trial. *State v. Theroff*, 95 Wn.2d 385, 622 P.2d 1240 (1980). Thus, contrary to the majority's assertion, the guilt phase of a capital case and the guilt phase of a noncapital case are not treated identically.

Ct. 2765, 2770 (1989). That greater degree of reliability requires not only a heightened scrutiny, it also requires special constraints on procedures used to convict a defendant of a capital offense. *Murray*, 492 U.S. at 8-9. Thus procedures that are permissible in a noncapital case are not' always allowable in a capital case.

In *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978), the Court held capital juries cannot be precluded from considering any relevant mitigating evidence, including aspects of the defendant's character. The Court acknowledged, however, that state legislatures are free to limit the evidence a noncapital sentencer may consider. 438 U.S. at 603. The Court also acknowledged that legislatures are free to enact mandatory sentences in noncapital cases. 438 U.S. at 605 n.13. A legislature may not, however, enact a mandatory death penalty. *Woodson v. North Carolina*, 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976).

In *Beck v. Alabama*, 447 U.S. 625, 65 L. Ed. 2d 392, 100 S. Ct. 2382 (1980), the Court held a death sentence may not be imposed where a statute prohibited the jury from considering a lesser included, noncapital offense. The Court noted that while the constitution does not require the giving of lesser included offense instructions in noncapital cases, the need for heightened reliability in capital cases means the trial court must give such instructions where warranted by the evidence. 447 U.S. at 637-38.

Thus the constitution requires not only that we engage in a closer, more careful review of the record, it also requires us to determine that the procedures used meet the standard of increased reliability. The trial court erred both in admitting the chart and in sending that chart to the jury room. Even if that error could be corrected in a noncapital case by giving a limiting instruction and allowing cross examination, the qualitative difference between the death penalty and any other punishment requires us to apply stricter procedures and heightened scrutiny in

this case.[40] The admission of the chart and the trial court's subsequent decision to send the chart to the jury room undermine the reliability of the jury's decision. Therefore this court should reverse the finding of guilt.

## II

A. Violation of Bartholomew.

*State v. Bartholomew*, 101 Wn.2d 631, 683 P.2d 1079 (1984) (*Bartholomew* II) limits the evidence the State may present at the penalty phase of a capital trial. The State is

> limited to defendant's criminal record, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by the defendant.

101 Wn.2d at 642. Any rebuttal evidence the State offers is subject to a balancing test similar to that contemplated by ER 403. 101 Wn.2d at 643. Such evidence is only admissible if its rebuttal value outweighs its prejudicial effect. 101 Wn.2d at 643.

As discussed below, the challenged evidence in this case does not properly rebut any mitigating evidence. Additionally, even if that evidence had some slight rebuttal value, that value is outweighed by the evidence's prejudicial effect. Therefore the court erred in admitting all of the challenged evidence.

The majority acknowledges the *Bartholomew* test and then analogizes it to ER 405. That analogy ignores a basic difference between the two tests. ER 405(a) states:

> In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation. On cross examination, inquiry is allowable into relevant specific instances of conduct.

Thus, under ER 405, once character evidence is introduced there is a presumption that rebuttal evidence is admissible.

---

[40]*Cf. Caldwell v. Mississippi*, 472 U.S. 320, 329, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985) ("the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination").

Under the *Bartholomew* test, however, there is a presumption that rebuttal evidence is *inadmissible*. The rule as stated in *Bartholomew* II is:

> Only if the rebuttal value of the evidence outweighs the prejudicial effect should the evidence be admitted.

101 Wn.2d at 643 (quoting *State v. Bartholomew*, 98 Wn.2d 173, 198, 654 P.2d 1170 (1982), *State's cert. granted and remanded*, 463 U.S. 1203, *defendant's cert. denied*, 463 U.S. 1212 (1983)). Thus the presumption is that rebuttal evidence is inadmissible. The State can overcome that presumption by proving that the evidence's rebuttal value outweighs its prejudicial effect.

Applying the *Bartholomew* test is a 2-step process. The first step is to determine whether the offered evidence has any rebuttal value. If the evidence has no rebuttal value, it is inadmissible. Once it is established that the evidence has some rebuttal value, the second step is to determine whether that rebuttal value outweighs the evidence's prejudicial effect. If it does not, then the evidence is inadmissible.

Lord assigns error to the admission of evidence elicited during the State's cross examination of his father, Leslie.[41] Specifically, Lord argues the trial court erred in allowing the State to elicit information concerning the facts underlying Lord's second degree murder conviction and his conviction for unlawful imprisonment, the fact that he violated probation, and the fact that he fled from the police. Because I believe both that none of that evidence was proper rebuttal evidence, and that the evidence is prejudicial, I would vacate Lord's sentence.

The majority concludes that all of the challenged evidence was properly admitted to rebut the "evidence of good character offered by Lord's father." Majority opinion, at 894. As an example of the supposed evidence of "good character", the majority cites two exchanges in which Leslie said his son was a "good boy". Read in the proper

---

[41] I will follow the majority's terminology and refer to the defendant as "Lord" and to all other family members by their first name.

context of the entire direct examination, however, those comments cannot properly be seen as being offered as evidence of good character.

The first such comment occurred in the following exchange:

Q: Could you describe for this jury what type of child Keith was up until the age of 14?
A: He was a good boy, a loving kid and just a real good kid. . . .

Report of Proceedings vol. L, at 7723. Taken in proper context, Leslie's testimony was that his son was a good boy up until the age of 14. All of the challenged evidence concerns events that happened after Lord turned 14. There is no evidence that suggests Lord was not "a good boy" prior to turning 14. Thus none of the State's evidence rebuts Leslie's testimony.

The following exchange occurred at the end of the defendant's direct examination of Leslie.

Q: Les, do you know what Keith has been convicted of?
A: Yes, I do.
Q: You know what his past is, don't you?
A: Yes.
Q: How do you feel about him now?
A: I love him dearly. I love him. He's a good boy.

Report of Proceedings vol. L, at 7730. That was the last question and answer in the direct examination. Taken in context, the statement "[h]e's a good boy" cannot reasonably be interpreted as evidence of Lord's good character. Instead, it was simply a profession of a father's love for his son, despite all of the son's mistakes. The statement was not a positive factual assertion that warranted rebuttal. It was an emotional response to the question "How do you *feel* about [defendant]?" (Italics mine.)

This conclusion is borne out by Leslie's later answer to one of the prosecutor's questions. In response to the prosecutor's question of whether he still considered his son to be a good boy, Leslie replied: "Well, I still love him. He's my son." Report of Proceedings vol. L, at 7740. This shows that Leslie was not offering an objective opinion as

to his son's character. Instead, he was simply reaffirming that he still loved his son.

This is not a case where a witness must be impeached with specific instances of the defendant's bad conduct in order to give the jury a proper context for evaluating the witness' testimony. Leslie testified he knew about all of his son's convictions, and about the facts of the Tracy Parker murder, but still loved his son. The jury knew about Leslie's bias, and could evaluate how much weight to give his testimony. In light of that, there was no need to attempt to "impeach" Leslie. Nothing in his testimony could have reasonably left a false impression as to Lord's character. The only impression the testimony could have reasonably left with the jury was that Leslie still loved his son.

Leslie did offer as mitigating evidence the fact that his son was a good carpenter and that his son had been in a serious car accident. The fact that Leslie loved his son may also be considered mitigating evidence. *See, e.g., Payne v. Tennessee*, ___ U.S. ___, 115 L. Ed. 2d 720, 111 S. Ct. 2597, 2602 (1991); *Jones v. Butler*, 864 F.2d 348, 366 (5th Cir. 1988), *cert. denied*, 490 U.S. 1075 (1989). However, none of the State's challenged evidence rebuts that mitigating evidence. Therefore the evidence's rebuttal value is nonexistent, and it was error to admit that evidence.

Even if the evidence has some rebuttal value, that rebuttal value does not outweigh the evidence's prejudicial effect. Therefore the court still erred in admitting that evidence.

On cross examination the State elicited information that the victim in Lord's unlawful imprisonment conviction was hospitalized. The majority asserts this was not prejudicial because the jury already knew the crime was " 'effected by violence, menace, fraud, and deceit'." The majority concludes "[t]he infliction of injuries is inherent in a crime committed by violence." Majority opinion, at

893. That conclusion defies both common sense and the law.

Injury simply is not an inherent part of a crime of violence.[42] In Washington, a "violent offense" is defined as any class A felony or attempt to commit a class A felony. RCW 9.94A.030(33). That definition obviously encompasses many crimes that do not result in injury to the victim. Similarly, Black's Law Dictionary, at 1408 (5th ed. 1979) defines "violence" as:

> Unjust or unwarranted exercise of force, usually with the accompaniment of vehemence, outrage or fury. . . . Physical force unlawfully exercised; . . . The exertion of any physical force so as to injure, damage or abuse.

(Citations omitted.) That definition also encompasses many acts that do not result in injury.

More importantly, the California statute Lord violated does not define "violence" as necessarily including injury. Lord pleaded guilty to a violation of section 236 of the California Penal Code. That section defines the general crime of false imprisonment. Section 237 then goes on to define felony false imprisonment as imprisonment "effected by violence, menace, fraud, or deceit". "Violence" is defined as "the exercise of physical force used to restrain over and above the force reasonably necessary to effect such restraint." *California Jury Instructions — Criminal* § 9.60, at 512 (5th ed. 1988). Thus, under the California law applicable to Lord's conviction, injury is not an inherent part of "violence".

The State also elicited on cross examination the fact that the victim of the unlawful imprisonment was a teenager. Contrary to the majority's conclusion, that information was also prejudicial. Prior to the cross examination of Leslie Lord, the jury knew only that the defendant had been convicted of unlawful imprisonment of a woman. After the cross examination, the jury knew the victim was a teenager, was injured and hospitalized, and that the

---

[42]Even if it were, the testimony here went much further. Leslie Lord testified not just that the victim was injured, but that she was hospitalized as a result of her injuries. Report of Proceedings vol. L, at 7737.

incident involved the defendant giving the victim a ride in his car. Thus the improper cross examination elicited information that highlighted the similarities between the unlawful imprisonment conviction and the murder of Tracy Parker. It is the similarity between the improperly elicited evidence and the murder of Parker that creates prejudice. *Cf. State v. Pam*, 98 Wn.2d 748, 761-62, 659 P.2d 454 (1983) (Utter, J., concurring in the result) (prejudice arising from introduction of prior crimes under ER 609 is great where the prior crime is similar to the charged crime); *State v. Bowen*, 48 Wn. App. 187, 195, 738 P.2d 316 (1987) (same).

The State also elicited evidence that Lord violated the conditions of his probation and attempted to escape from the police. The majority argues any prejudice arising from that evidence is "insignificant given that the jury was properly aware of both of Lord's prior convictions for violent crimes." Majority opinion, at 894. Taken to its logical conclusion, the majority's argument would mean almost no error would ever prejudice a defendant with a violent past. Indeed, the next logical step in the majority's analysis is to conclude that the prejudice would be insignificant given that the jury was already properly aware of the circumstances of the Parker murder. After all, how prejudicial is a probation violation in light of a conviction for aggravated first degree murder? Such a decision would, of course, make a mockery of the reasoning in *Bartholomew* I and II. It would also ignore our responsibility to assure that any person sentenced to death is afforded due process.

Furthermore the evidence of the alleged probation violation is exactly the kind of unreliable evidence warned against in *Bartholomew* II. The only evidence of any probation violation came out in the cross examination of Leslie. The following exchange shows how unreliable that evidence is.

Q: So [the defendant] did not obey the Court's order of probation after he was placed on probation for the crime of murder in the second degree?
A: Well, I don't know really if he did or not.
Q: Did he have to spend 30 days in jail because he did not obey the probation rules for this homicide?

A: I wouldn't know for sure about that. I know he was in jail there for — I don't remember whether it was 30 days or 20 days, but he was, and I don't recall what it was for.

Report of Proceedings vol. L, at 7734-35. The State presented no other evidence that Lord was ever found guilty of a probation violation. Thus the evidence of that alleged violation lacks the reliability necessary to make it admissible in a capital sentencing proceeding. *See Bartholomew II*, 101 Wn.2d at 640-41.

As pointed out earlier, *Bartholomew* creates a presumption that rebuttal evidence is inadmissible. The State can overcome that presumption by proving beyond a reasonable doubt that the evidence's rebuttal value outweighs its prejudicial effect. Where the evidence is as unreliable as is the evidence of the alleged probation violation, the State can never meet that burden.

There is also no reliable evidence of Lord's alleged attempt to flee the police. During the course of cross examination, Leslie testified his son left the scene of the false imprisonment crime and that the police chased his son. Report of Proceedings vol. L, at 7739. That testimony was based on Leslie's recollection of police reports he had read "years ago" and which he acknowledged he could not accurately remember. Report of Proceedings vol. L, at 7737. Leslie never discussed the incident with his son. Report of Proceedings vol. L, at 7738. The only evidence of Lord's attempted flight was the incomplete hearsay recollections of Leslie. That evidence is surely not reliable enough to have any rebuttal value in a capital case.

The State also improperly elicited information concerning Lord's second degree murder conviction. The cross examination improperly brought out inflammatory facts about the details of the murder. There was no reliable corroborating evidence of any of those facts, and many were based on hearsay.[43] Those facts were not relevant to

---

[43]"Q: How was she murdered?
"A: She was shot.
"Q: From one gun or two guns?
"A: Well, they said there was two guns involved.
"Q: Two separate guns she was shot with; isn't that correct, Mr. Lord?
"A: That's what they said, yes." Report of Proceedings vol. L, at 7731.

rebut any mitigating evidence. Therefore the court erred in allowing that cross examination.

The majority concludes that none of the challenged evidence discussed above was unduly prejudicial. The prosecutor's closing argument belies that conclusion. In her closing argument the prosecutor emphasized all of the erroneously admitted evidence. She paid particular attention to the facts surrounding Lord's two previous convictions, and made powerful arguments that could not help but play on the jurors' emotions.[44] She emphasized that the victim in the false imprisonment case "was a teenager, just like Tracy Parker." Report of Proceedings vol. LI, at 7883. Thus all of the improperly elicited information was used to Lord's prejudice.

Improperly admitting the evidence allowed the State to argue nonstatutory aggravating factors to the jury. The danger in allowing such evidence is that it

> opens too wide a door for the influence of arbitrary factors on the sentencing determination.

*Bartholomew* I, 98 Wn.2d at 195 (quoting *Henry v. Wainwright*, 661 F.2d 56, 59 (5th Cir. 1981)). Allowing the jury to consider nonstatutory aggravating factors also defeats the constitutional mandate of channeled jury discretion. 98 Wn.2d at 195. In *Bartholomew* I, this court decided those dangers dictate that the court limit the evidence put before the jury. 98 Wn.2d at 196. Specifically, this court held:

> Information relating to defendant's criminal past should therefore be limited to his record of convictions.

98 Wn.2d at 197. The evidence admitted in this case goes beyond the scope of *Bartholomew* I and does not properly rebut any mitigating evidence. In concluding the evidence was properly admitted, the majority ignores *Bartholomew* II's warning that

> [the court] do[es] not intend . . . that the prosecution be permitted to produce any evidence it cares to so long as it

---

[44] I do not mean to imply nor do I believe there is anything improper with the manner in which the prosecutor gave her closing argument.

> points to some element of rebuttal no matter how slight or incidental.

101 Wn.2d at 643 (quoting *Bartholomew* I, at 198). Any rebuttal value the challenged evidence has is certainly slight and incidental. Therefore introduction of that evidence was error, and we should vacate Lord's sentence and remand for a new sentencing proceeding untainted by the improperly admitted evidence.

In *Bartholomew* II, we deemed it necessary under both the eighth amendment of the federal constitution and article 1, section 14 of this state's constitution to channel the jury's discretion at the sentencing phase of a capital case. In that case we recognized the importance of limiting the admission of nonstatutory aggravating factors at the sentencing stage. But now the majority's approach in effect opens the door for nonstatutory aggravating factors during the sentencing phase. The majority's generous notion of what constitutes rebuttal evidence will allow prosecutors to get in just about any nonstatutory aggravating factors during the sentencing phase, regardless of their reliability, on the pretext that it rebuts mitigating evidence. The majority also fails to take seriously the prejudicial effect of the testimony that was admitted in this case. Thus, the majority's approach will significantly undermine the court's efforts to channel jury discretion in the sentencing phase of capital cases. That approach is at odds with our holding in *Bartholomew* II, and infringes on the state and federal constitutional rights of capital defendants.

Our review of United States Supreme Court cases in *Bartholomew* II indicated that the strictures of the Eighth Amendment require that the jury's consideration of aggravating factors be limited at the sentencing stage of a capital case. *Bartholomew* II, 101 Wn.2d at 635-39. The Court has long allowed the defendant the opportunity to introduce any relevant mitigating factors. *See California v. Brown*, 479 U.S. 538, 541, 93 L. Ed. 2d 934, 107 S. Ct. 837 (1987); *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed.

2d 973, 98 S. Ct. 2954, 2964 (1978). The Court, however, has taken a more stringent view of what kinds of aggravating evidence can be admitted. As the Court wrote in *Gregg v. Georgia*, 428 U.S. 153, 203-04, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976):

> We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. . . . *So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant*, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

(Italics mine.) *See also California v. Ramos*, 463 U.S. 992, 1009 n.23, 77 L. Ed. 2d 1171, 1186, 103 S. Ct. 3446, 3457 (1983). *Barefoot v. Estelle*, 463 U.S. 880, 926, 77 L. Ed. 2d 1090, 1125, 103 S. Ct. 3383, 3411 (1983); *Zant v. Stephens*, 462 U.S. 862, 886, 77 L. Ed. 2d 235, 256, 103 S. Ct. 2733, 2748 (1983). As the court in *Bartholomew* II noted, this "prejudice" concept subjects evidence submitted by the prosecution to a more rigorous standard than that advanced by the defendant at the sentencing phase of a capital trial. *Bartholomew* II, 101 Wn.2d at 637. The *Bartholomew* II court also noted that the provisions of article 1, sections 3 (due process) and 14 (cruel punishment) of the Washington State Constitution limit the range of evidence a prosecutor may introduce. 101 Wn.2d at 639. Therefore, the majority's approach to the *Bartholomew* test infringes on the federal and state constitutional rights of capital defendants.

B. Cross Examination of Lord's Allocution Statement.

Prior to closing argument, Lord exercised his common law right to allocution. The purpose of allocution is to provide the defendant an opportunity to plead for leniency. *See State v. Happy*, 94 Wn.2d 791, 793, 620 P.2d 97 (1980); Marshall, *Lights, Camera, Allocution: Contemporary Relevance or Director's Dream?*, 62 Tul. L. Rev. 207, 211 (1987). Allocution assures the sentencer will consider the defendant's position on sentencing prior to pronouncing

that sentence. *State v. Peterson*, 97 Wn.2d 864, 868, 651 P.2d 211 (1982).[45]

In this case, as the majority correctly points out, Lord went beyond the bounds of allocution. He engaged in more than just a plea for mercy. Nonetheless, the court still erred in allowing the State to cross-examine Lord.

By definition, allocution is an exchange between the defendant and the sentencer. Allocution does not involve the prosecutor. Neither the majority nor the State cite any case that holds there is a right to cross-examine a defendant after allocution. Instead, each cites language in *State v. Mak*, 105 Wn.2d 692, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash. 1991).

In *Mak*, the trial court rejected the defendant's request to make a statement to the jury *following* closing argument.[46] The language cited by the majority and the State merely holds a defendant may not make a statement to the jury *after* closing argument. Thus, *Mak* stands for the proposition the State must have an opportunity to rebut any statement the defendant makes. That rebuttal does not, however, have to take the form of cross examination. There is simply no language in *Mak* that says there is a right to cross-examine the defendant on his allocution statements.

*State v. Jeffries*, 105 Wn.2d 398, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986) illustrates the proper manner for dealing with a defendant's allocution. In *Jeffries*, the defendant did not testify during either the guilt or

---

[45]The court in *State v. Peterson, supra*, interpreted the right of allocution under former CrR 7.1. Nonetheless, the court's reasoning applies equally to the common law right of allocution.

[46]The opinion in *Mak* does not specifically state that defendant's request was to make a statement after closing argument. Such a conclusion is inevitable, however, from the fact Mak refused an opportunity to make a statement "prior to closing arguments". 105 Wn.2d at 729. Additionally, this court's observation that Mak's requested statement would be "unanswerable by argument", 105 Wn.2d at 729, only makes sense if Mak's request was to make a statement after argument.

penalty phases of the trial. He did, however, exercise his right to allocution. In closing argument the prosecutor referred to defendant's allocution:

> Well, you have heard the Defendant in a situation where he does not have to take an oath and in a situation that I can't cross-examine him and his statement, I submit is one that is insulting to the intelligence.

105 Wn.2d at 415. The prosecutor used the closing argument to rebut the allocution.[47]

That is the proper way to address allocution.

The essence of the majority's argument is that the State must be allowed to cross-examine in order to rebut "testimony" offered by Lord during his allocution. Cross examination is not, however, necessary to rebut the allocution. Instead, the prosecutor could object that the statement is beyond the bounds of proper allocution. During closing argument the prosecutor may remind the jury of any properly introduced evidence that rebuts the defendant's statements. The prosecutor may make reasonable inferences and argument related to the allocution. The prosecutor may also, as did the prosecutor in *Jeffries*, remind the jury that the defendant's statement is unsworn and not subject to cross examination. In that way, the prosecutor can sufficiently rebut any of the defendant's statements.

The rule the majority adopts is a trap for the unwary defendant. The majority places the burden solely on the defendant, and in so doing the majority fails to protect that defendant's rights. A better rule would be to require the prosecutor to object whenever he or she believes the defendant has gone beyond the proper bounds of allocution. That rule would protect both the State's and the defendant's interests. A proper objection would protect the State's interest in not having the defendant put unsworn testimony before the jury. It would also allow the court to

---

[47] I note that in *Jeffries* we did not comment on the prosecutor's assumption that he had no right to cross-examine after allocution.

protect the defendant's right to plead for mercy, by assuring the defendant does not go beyond the proper bounds of allocution.

The cross examination of Lord violated his right to due process, and his right to remain silent. Therefore, I would vacate the sentence on this ground as well.

C. Proportionality.

The majority holds Lord's sentence is proportionate to the sentences imposed on defendants in similar cases. I have previously discussed the difficulties in conducting proportionality review under our state statute. *See State v. Campbell*, 103 Wn.2d 1, 42, 691 P.2d 929 (1984) (Utter, J., concurring in part/dissenting in part), *cert. denied,* 471 U.S. 1094 (1985); *State v. Jeffries*, 105 Wn.2d 398, 435-37, 717 P.2d 722 *(Jeffries* I), *cert. denied*, 479 U.S. 922 (1986). The majority's attempt to clarify proportionality review does not eliminate the difficulty. I refer the court to my earlier opinions for further discussion of this issue.[48]

The majority correctly points out that proportionality review must include all cases where the defendant was convicted of aggravated murder, whether or not the State sought the death penalty. RCW 10.95.120, .130; majority opinion, at 908 n.27. Our goal is to ascertain whether the "sentence of death is excessive or disproportionate to the penalty imposed in similar cases". RCW 10.95.130(2)(b). The sentence is excessive and disproportionate if it has not *"generally* been imposed in similar cases". (Italics mine.) *In re Jeffries*, 114 Wn.2d 485, 490, 789 P.2d 731 (1990) *(Jeffries* II); *State v. Rupe*, 108 Wn.2d 734, 767, 743 P.2d 210 (1987), *cert. denied*, 486 U.S. 1061 (1988). A sentence is not "generally" imposed unless it is imposed in at least 50 percent of the similar cases. *Jeffries* I, 105 Wn.2d at 437 (Utter, J., dissenting).

The majority focuses on those cases in which the death penalty was actually imposed. It expends precious little

---

[48]*See also* Comment, *Washington's Comparative Proportionality Review: Toward Effective Appellate Review of Death Penalty Cases Under the Washington State Constitution*, 64 Wash. L. Rev. 111, 121 (1989).

ink in describing a few similar cases in which the death penalty was either not imposed or not sought by the prosecutor. It does not list all of the similar cases. When the majority does mention such cases, it does not describe the aggravating factors and mitigating factors in those cases. It does not describe the defendant's prior convictions in those cases. It superficially distinguishes those cases from this one without meaningfully comparing all of the relevant factors in those cases to the ones in this case. The majority then concludes that Lord's sentence is proportionate, because, in the majority's view, the death penalty has been imposed in similar cases.

This analysis ignores both the plain language of the statute and the basic purpose of proportionality review. Our statute requires us to consider all cases in which the defendant was found guilty of aggravated first degree murder, "regardless of whether [the death penalty] was imposed or executed". RCW 10.95.130(2)(b). Our task is not to determine whether the death penalty has ever been imposed in a similar case, but to determine whether it is *generally* imposed in similar cases.

To perform that task, we must compare the facts and circumstances of Lord's crime with those of all other similar aggravated first degree murder convictions. This comparison involves more than just a simple matching of aggravating factors. *Jeffries* II, 114 Wn.2d at 490. Nonetheless, our cases make it clear that similarity in aggravating factors is an element of proportionality review. *See, e.g., Jeffries* II, 114 Wn.2d at 491.

Because we must compare aggravating factors, I am compelled to briefly address whether there is sufficient evidence to support the jury's determination that Lord committed the murder in the course or furtherance of the crime of kidnapping. The majority concludes that, because there is sufficient evidence to support the finding of rape, it is unnecessary to address the sufficiency of the evidence of kidnapping. This conclusion is correct with regard to whether there is sufficient evidence to support the jury's verdict of guilt. With regard to proportionality review,

however, it would be fundamentally unfair to use an aggravating factor in determining the universe of similar cases if there was insufficient evidence to support that factor. Because I believe there is insufficient evidence to support a finding of kidnapping, I would not consider that aggravating factor in selecting the universe of similar cases.

The test for determining whether there is sufficient evidence to justify a finding of guilt beyond a reasonable doubt is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 220-21, 616 P.2d 628 (1980). In this case, there is insufficient evidence to meet the *Green* test.

The State's theory is that Lord lured Parker to Kirk Lord's workshop under the pretense of employing her to finish cabinets. The State argues that Lord "deceived" Parker into going to the workshop, and therefore kidnapped her by deception. To support that theory the State presented evidence that Lord offered Parker a job in June 1986. The State also presented evidence that Lord frequently gave Parker rides home. Finally, the State presented evidence that Lord made two phone calls from the Frye residence on the day Parker disappeared. The State theorized those calls were to assure that no one was at the workshop, and that no one would be looking for Lord.

The record is insufficient to establish the State's speculative theory. The first of Lord's calls was placed to his girl friend while Parker was almost a mile away from the Frye house. There is nothing to indicate Lord knew Parker was out riding her horse, or that she would be arriving at the Frye house in the near future. Thus there is nothing in the record to support the speculative theory that Lord placed the call to assure no one would be looking for him.

There is also nothing to support the speculation that Lord lured Parker to the workshop with a job offer. The

original offer was made 6 months earlier, and there is no evidence to indicate Lord ever renewed the offer. Therefore, the State's evidence is insufficient to support the kidnapping charge.

Because there is insufficient evidence to support the finding that the murder was committed during the course or furtherance of kidnapping, we must disregard that finding. Therefore, we need only consider the following three aggravating factors: the murder was committed to conceal commission of a crime, to conceal the identity of the perpetrator of a crime, and in the course or furtherance of the crime of rape.

We must do more than just look at aggravating factors, however. We also must examine any relevant mitigating factors. *Jeffries* II, 114 Wn.2d at 490. Lord put on mitigating evidence that he has an antisocial personality disorder, he has substance abuse problems with alcohol and marijuana, and his family loves him. He also presented evidence that he is a good carpenter.

In performing proportionality review, we must also take into consideration the defendant's criminal record. Lord has two prior convictions, including one for a second degree murder he committed when he was 14 years old.

A review of trial judge reports and published cases reveals 24 cases in which the defendant was convicted of aggravated murder with rape as an aggravating factor. Juries imposed death sentences in only three of those cases: Westley Dodd (Clark Cy. causes 89-1-01133-6, 89-1-01134-4); Michael Furman (Kitsap Cy. cause 89-1-00304-8); and Lord. Because this court has yet to review either Dodd's or Furman's conviction and sentence, those cases have little value for proportionality review purposes. Nonetheless, it is worth noting that Dodd pleaded guilty to brutally raping and murdering three children. The facts of Dodd's convictions for three counts of aggravated murder do not seem similar to Lord's case.

Furman's case also seems dissimilar. The jury found five aggravating factors in Furman's case, as opposed to three in Lord's case. Three of the factors were the same in

both cases, but the jury in Furman's case also found that he committed the crime in the course or furtherance of burglary and robbery. Furman also had more prior convictions than Lord, albeit mostly for property crimes.

In addition to Dodd, Furman, and Lord, there are six other rape/murder cases in which the jury found the existence of at least three aggravating factors. Of those six, we should consider five as being similar to Lord's case.

A jury convicted David Duhaime of premeditated murder in the first degree for raping and murdering a 17-year-old girl. *State v. Duhaime*, 29 Wn. App. 842, 631 P.2d 964 (1981), *review denied*, 97 Wn.2d 1009 (1982).[49] The jury also found Duhaime guilty of rape, kidnapping, and robbery, all in the first degree. Duhaime "brutally stabbed" his victim to death and left her body lying in the snow. There is no mention in the case of any mitigating factors. The jury did not impose the death penalty.

James Dykgraaf tied his victim up, raped her, strangled her, and shot her. Report of the Trial Judge, Clark Cy. cause 86-1-00111-5. The jury found four aggravating circumstances: the murder was committed to conceal the identity of the perpetrator, and the murder was committed in the course or furtherance of burglary, rape and robbery. Dykgraaf presented mitigating evidence that he has a "mixed personality disorder" and that his father was a "domineering" man who had raped Dykgraaf's sisters. Dykgraaf has one prior conviction for first degree assault with intent to rape. Thus, like Lord, Dykgraaf has a history of violence toward women. The jury did not impose the death penalty.

Russell Stenger kidnapped a 23-year-old jogger. Report of the Trial Judge, Clark Cy. cause 87-1-00951-3. He took her to two different locations, and raped her repeatedly at each. Stenger then tied his victim to a tree and shot her. He has three prior felony convictions. The jury found three aggravating factors. There was no credible evidence of mitigating factors. The trial judge described the killing

---

[49]Because Duhaime's conviction occurred prior to May 14, 1981, the trial judge was not required to submit a report to this court. *See* RCW 10.95.120.

as "most heinous". The State did not seek the death penalty.

Ronald Thomas "hog-tied" his victim to her bed, raped her and strangled her. Report of the Trial Judge, King Cy. cause 86-1-04723-5. The jury found three aggravating factors: the murder was committed to conceal the identity of the perpetrator and the murder was committed in the course or furtherance of rape and robbery. There was no credible evidence of mitigating factors. Thomas has three prior convictions, including one for armed robbery. The State did not seek the death penalty.

Daniel Yates raped and murdered a 13-year-old girl. Report of the Trial Judge, Kitsap Cy. cause 87-1-00444-7. The jury found Yates guilty of three counts of first degree rape and two counts of attempted first degree murder. Yates has five priors, including one for armed robbery. The jury found the same three aggravating factors as in Lord's case, plus the additional factor that the murder was committed in the course or furtherance of kidnapping. There was no credible evidence of mitigating factors. The jury did not impose the death penalty.

The above cases have similar numbers and types of aggravating factors. Proportionality review requires that we do more than just match aggravating factors, however. *In re Jeffries*, 114 Wn.2d 485, 490, 789 P.2d 731 (1990). We must also examine the facts of the crime and the characteristics of the defendant. Thus there are several other cases that we should consider as being similar for purposes of proportionality review.

Bruce Bushey beat, raped, and strangled a woman he had met a few hours before the murder. Report of the Trial Judge, King Cy. cause 84-1-02746-7. His prior conviction for second degree rape establishes a pattern of violence against women. There was no credible evidence of mitigating factors. The jury did not impose the death penalty.

Kenneth Hovland "brutally" raped and sodomized a 16-year-old girl. Report of the Trial Judge, Snohomish Cy. cause 81-1-00678-1. He stabbed her repeatedly and suffo-

cated her by forcing her face into mud. The jury found two aggravating factors: the murder was committed in the course or furtherance of rape and in the course or furtherance of kidnapping. Hovland has two prior convictions for nonviolent offenses. There was no credible evidence of mitigating factors. The State did not seek the death penalty.

Michael Ihde raped and strangled a 67-year-old retired nurse. Report of the Trial Judge, Clark Cy. cause 87-1-00126-1. He raped her vaginally, orally, and anally. Ihde has four prior felony convictions, including one for rape and one for assault with intent to kill. The jury found two aggravating factors: the murder was committed in the course or furtherance of rape and in the course or furtherance of robbery. There was no credible evidence of mitigating factors. The State did not seek the death penalty.

Sherwood Knight raped and strangled his victim. Report of the Trial Judge, King County cause 86-1-01678-0. The jury found the aggravating factors that the murder was committed in the course or furtherance of rape and in the course or furtherance of robbery. Knight has six prior convictions, including three felonies. There was no credible evidence of mitigating circumstances. The State did not seek the death penalty.

A review of the cases indicates the death penalty is not generally imposed in cases similar to Lord's. There is no principled way to distinguish Lord's case from those cases in which the death penalty was not imposed. Therefore Lord's sentence is excessive and disproportionate. I would vacate that sentence.

## Conclusion

The trial court erred both in admitting the summary chart and in sending the chart into the jury room. The chart inaccurately summarizes the evidence by converting the expert's speculative and inconclusive testimony into conclusory facts. In so doing the chart unfairly emphasizes the State's interpretation of that testimony and

draws conclusions for the jury. Admission of the chart violated Lord's right to due process. Therefore, I would reverse the finding of guilt.

Even if the finding of guilt is not reversed, the errors in the sentencing phase require us to vacate the sentence. The trial court erred in allowing the State to elicit the facts underlying Lord's previous convictions. That evidence is prejudicial and does not properly rebut any mitigating evidence offered by Lord. The trial court also erred in allowing the prosecutor to cross-examine Lord after Lord exercised his right to allocution. Allocution is not subject to cross examination. Instead, the prosecutor should have objected to any alleged violation of the limits of allocution. Absent such objection, the prosecutor cannot complain that Lord exceeded the proper bounds of allocution.

Finally, I dissent because Lord's sentence of death is disproportionate to the sentences imposed on other defendants who committed similar crimes. A sentence of death is disproportionate unless it is generally imposed in similar cases. To be generally imposed, a sentence must be imposed in at least 50 percent of the cases. My analysis reveals nine rape/murder cases that are similar to Lord's case. None of the defendants in those nine other cases was sentenced to death, despite the fact that in eight of those cases the trial judge determined there was no credible mitigating evidence. Therefore, I would vacate Lord's sentence as being disproportionate.

SMITH, J., concurs with UTTER, J.

Reconsideration denied March 17, 1992.